*Fee paid*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

EARL JAMES GOBIN

Write the full name of each plaintiff.

**20-cv-5430**

(Include case number if one has been assigned)

-against-

IBM CORPORATION
GINNI ROMMETTY &
IBM'S BOARD OF MANAGEMENT

Write the full name of each defendant. The names listed above must be identical to those contained in Section I.

Do you want a jury trial?
☐ Yes   ☐ No

RECEIVED
JUL 10 2020
PRO SE OFFICE

## EMPLOYMENT DISCRIMINATION COMPLAINT

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I.   PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

EARL     J     GOBIN
First Name     Middle Initial     Last Name

4386   CEDAR   WOOD   DRIVE SW
Street Address

LILBURN     GA     30047
County, City     State     Zip Code

678-849-2576     eagobinoor@gmail.com
Telephone Number     Email Address (if available)

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:  IBM   CORPORATION | GINNI   ROMETTY (EX-CE
IBM   BOARD   OF   MANAGE
Name

1   NEW   ORCHARD   ROAD
Address where defendant may be served

ARMONK     NY     10504-1722
County, City     State     Zip Code

Defendant 2:  IBM   BOARD   OF   MANAGEMENT
Name

1   NEW   ORCHARD   ROAD
Address where defendant may be served

ARMONK     NY     10504-1722
County, City     State     Zip Code

Defendant 3:

_____
Name

_____
Address where defendant may be served

_____
County, City                    State            Zip Code

## II.   PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

EARL   JAMES   GOBIN
Name
4386   CEDAR   WOOD   DRIVE   SW
Address
LILBURN          GA          30047
County, City        State        Zip Code

## III.   CAUSE OF ACTION

### A.  Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☑ **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin (AGE   DISCRIMINATION)

The defendant discriminated against me because of my (check only those that apply and explain):

☐ race: _____

☐ color: _____

☐ religion: _____

☐ sex: _____

☐ national origin: _____

☑ AGE { I WAS TERMINATED BY IBM ABRU... PRE-MATURELY DURING AN INTE... WHILST I WAS BASED IN BEIJING, CHINA. THIS IS UNPREC... ASSIGNMENT ACTION TAKEN BY A GLOBAL COMPANY...

☑ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

My race is: _TRINIDAD & TOBAGO (BROWN SKIN COLOR)_

☐ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

I was born in the year: _1956_

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

**B. Other Claims**

In addition to my federal claims listed above, I assert claims under:

☑ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☑ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☐ Other (may include other relevant federal, state, city, or county law):

_THE STATE OF GEORGIA & BEIJING, CHINA._

## IV.   STATEMENT OF CLAIM

### A.  Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐  did not hire me
- ☑  terminated my employment
- ☐  did not promote me
- ☐  did not accommodate my disability
- ☐  provided me with terms and conditions of employment different from those of similar employees
- ☐  retaliated against me
- ☐  harassed me or created a hostile work environment
- ☐  other (specify):

### B.  Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

I HAVE PREPARED A DETAILED AND COMPEHENSIVE LEGAL BRIEF FOR THE DISTRICT COURT AND THE COURT ASSIGNED ATTORNEY WHO WIL BE REPRESENTING ME AGAINST IBM IN THIS 'AGE' DISCRIMINATION LAWSUIT. (SEE ATTACHED). I WAS ALSO TERMINATED ABRUPTLY WITHOUT CAUSE DURING AN INTERNATIONAL ASSIGNMENT IN CHINA.

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency. THE EEOC CHARGE NO IS 520-2014-01429. I ? NOT HAVE A COPY OF MY EEOC CHAGE FIL I AM HOPING THAT THE DISTRICT COURT CAN FORMALLY REQUEST MY FILE F THE EEOC NY OFFICE.

## V.   ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☑ Yes (Please attach a copy of the charge to this complaint.)

When did you file your charge?  June 11th, 2014

☐ No

Have you received a Notice of Right to Sue from the EEOC?

☐ Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice?  _____

When did you receive the Notice?  _____

☐ No

## VI.   RELIEF

The relief I want the court to order is (check only those that apply):

☐ direct the defendant to hire me

☐ direct the defendant to re-employ me

☐ direct the defendant to promote me

☐ direct the defendant to reasonably accommodate my religion

☐ direct the defendant to reasonably accommodate my disability

☑ direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)

IBM TERMINATED ME ABRUPTLY & PRE-MATURELY WITHOUT CAUSE, THEY COMPLETELY DESTROYED MY CREDIBILITY AND DIGNITY. I ~~AND~~ NOW UNDERSTAND THAT THEY HAD A HIDDEN, BUT DEFINED HR POLICY TO GET RID OFF 20 THOUSA~ MEN WHO WERE 40+ YRS OLD IRRESPECTIV OF THEIR PERFORMANCE ON THE JOB! WHAT MAKES MY CASE UNIQUE, IS THAT ~ WAS FIRED DURING AN INTERNATIONAL ASSISNM

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | |
|---|---|
| _July 1st, 2020_ | _Earl James Gue_ |
| Dated | Plaintiff's Signature |
| _EARL_        _J_ | _GOBIN_ |
| First Name      Middle Initial | Last Name |
| _4386   CEDAR   WOOD   DRIVE   SW_ | |
| Street Address | |
| _LILBURN_ | _GA_        _30047_ |
| County, City | State        Zip Code |
| _678- 849 - 2576_ | _eagobinoolo@gmail.com_ |
| Telephone Number | Email Address (if available) |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

RECEIVED
JUL 10 2020
PRO SE OFFICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

EARL JAMES GOBIN
(In the space above enter the full name(s) of the petitioner(s).)

__ Civ. _____ (__)(__)

-against-

IBM CORPORATION
GINNI ROMETTY (EX-CEO)
+ IBM'S BOARD OF MANAGEMENT

**APPLICATION FOR THE COURT
TO REQUEST COUNSEL
PURSUANT TO 18 U.S.C. § 3006A(g)**

_____

(In the space above enter the full name(s) of the defendant(s)/respondent(s).)

I, EARL JAMES GOBIN , *(print or type your name)* am a party in this case and am unable to afford the services of an attorney. I hereby request the Court to grant my request for counsel to represent me in this proceedings.

1.      In support of my application, I provide the following information:

A.      Explain why you feel you need a lawyer in this case. (Use additional paper if necessary)

THIS IS AN 'AGE' DISCRIMINATION CASE AGAINST A GLOBAL TECHNOLOGY COMPANY. SEVERAL INDIVIDUAL AND CLASS ACTION LAWSUITS HAVE BEEN FILED AGAINST IBM FOR 'AGE' DISCRIMINATION TARGETING MEN OVER

B.      Explain what steps you have taken to find an attorney and with what results. (Use additional paper if necessary)

I HAVE TRIED TO ENGAGE MORE THAN TEN EMPLOY LAW FIRMS ACROSS THE NATION. ALL OF THEM ARE NOT WILLING TO TAKE MY CASE AND REPRESENT ME.

C.      If you need a lawyer who speaks in a language other than English, state what language you speak:

N/A.

*Rev. 10/2010*

2.     In further support of my application, I declare that (check appropriate box):

☐    I have previously filed a Request to Proceed *In Forma Pauperis* application in this proceeding, and it is a true and correct representation of my current financial status.

☐    I have not previously filed a Request to Proceed *In Forma Pauperis* in this proceeding, and now attach an original Request to Proceed *In Forma Pauperis* application detailing my financial status.

☐    I have previously filed a Request to Proceed *In Forma Pauperis* application in this proceeding, however, my financial status has changed.  I have attached another Request to Proceed *In Forma Pauperis* application showing my current financial status.

3.     I understand that if a lawyer volunteers to represent me and that lawyer learns that I can afford to pay for a lawyer, the lawyer may give this information to the Court.

4.     I understand that if my answers on this application are false, my case may be dismissed.

5.     **I declare under penalty of perjury that the foregoing is true and correct.**

Dated: _July 1st, 2020_          _Earl [signature]_

                                              *Signature*

✱ N.B ( I AM WILLING TO PAY THE ASSIGNED DISTRICT COURT ATTORNEY ON A CONTINGECY BASIS I.E IF IBM SETTLES MY FINANCIAL CLAIM); IF THE DISTRICT COURT RECOMMENDS AND APPROVES THIS PAYMENT TO THE ASSIGNED ATTORNEY!

*Rev. 10/2010*

July 1st, 2020

**Earl James Gobin Vs IBM Corporation Legal Brief (Age Discrimination - ACT
(ADEA))**

**Introduction**

I would like the **South District Court Of New York (SDNY)** to file a lawsuit on my
behalf against IBM Corporation. **The Defendants** are **Ginni Rometty (Ex-CEO) & the
Relevant Board Of Management** during her tenure which ended in April 2020. On
**Ginni's watch**, IBM experienced declining revenues for almost thirty (30) consistent
quarters. In addition, she made some very bad and costly acquisitions in the industry.
The worst was acquiring **Red Hat for thirty three (33) billion dollars. Yet - Ginni was
paid 137 million dollars** by the Board Of Directors. I am sure on her retirement, she
also landed with a **'golden parachute'**. This was sanctioned by the Board of
management of IBM consistently since she assumed the CEO role. Ms Rometty was
treated indulgently by the Board although she was a very bad performer with no vision,
strategy, and the required leadership skills to steer IBM. I submit, because of IBM's
declining revenues and bad performance, we paid for Ginni's & her board of
management mistakes by being fired because we met their defined criteria of 1) 40+
years, 2) Gender specific - Men, & 3) We were segmented in a bucket - not based on
our performance or contribution to the company. It's noteworthy that IBM HR had a
grading system for annual performance **(1), (2), (3) or (4). (1)** was the highest
performance. Yet, Management was dictated by senior management to give out
specified numbers of grades (1) (handful/minority), 2, 3 & 4 irrespective of an
employee's performance and contribution. They gave out very few (1)'s, since this grade
came with an increase in salary. (see attached articles). Line management became
subjective about their employee performance. They lost all objectivity since they only
followed the dictates of their leadership team. **On Ginni Rometty's watch and
direction twenty thousand men were terminated across the Globe. I refer you to
this relevant youtube video in context of my Age discrimination claim against
IBM:**

https://www.youtube.com/watch?v=e681QNbHloE

The majority of retrenchment took place with employees on the US payroll. My case is
unique as explained in my background section below. I was on an international
assignment based in Beijing, China when IBM informed me through my line manager
**(Thomas Klein)** that my services were no longer required. This is unprecedented, since
global companies have to find a job for the employee on international assignment when

they repatriate back to their home country (USA). I would like the district court to legally challenge this as well. In summary, where is the justice for ordinary employees like my-self. We **paid the ultimate price & sacrifice** for a poorly managed company by **Ginni Rometty and her Board Of Directors**. Twenty thousand employees of IBM became a mere statistic as we were forced to leave IBM pre-maturely and abruptly. Both IBM And The Board Of Directors are culpable in this Age discrimination lawsuit and should be jointly held responsible for this **"crime against humanity"**.

Throughout my career I have always been a global advocate for human rights, the preservation of human dignity, justice and equality. I am now focused (**Full Time**) on giving a voice to the oppressed, suppressed and repressed peoples all over the Globe. The irony is that now, I am seeking justice for myself against Corporate America (**David Vs Goliath**).

## Background

I was hired by IBM corporation in May 2008 as a global sales executive. I covered the Caribbean and Latin American markets for the first two years of my employment. Given my sterling performance in the execution of my role, I was then promoted to cover the Americas region including Canada and Mexico. I successfully executed this role for another two years. IBM then decided to establish a center of competency in **Beijing, China** for an emerging technology aka **"Big Data Analytics"**. Given my proven track record with IBM, I was one of five individuals hand picked to join an expatriate global team based in **Beijing, China** on an international assignment. It's noteworthy that the interview and selection process for landing an international assignment role at IBM is a very rigorous process because of the personal sacrifice which is required of the candidate for the job role as well as the adjustment required by the professional for living and working in another host country given the inherent culture and language differences. This newly established Big Data Analytics center of competency covered IBM's key growth market units i.e SE Asia as well as Latin America Markets. In December 2012, My then manager **(Tom Klein)** called me whilst I was on a business trip in South America, and advised me of IBM's plan to terminate me in effect rendering my job redundant.. He did not offer his help to land me a comparable job role on my return to the USA. This is a standard and fair procedure associated with any international assignment. I was shell shocked because of the following **KEY** data points:-
**1)** HR IBM never had any adverse reports on file from my management during my tenure at IBM. In addition, there was absolutely no **"paper trail"** in IBM HR in relation to any adverse performance on my part.

**2)** I took up this international assignment with the understanding that IBM will find a suitable position for me on repatriation back to my home country (USA). In my humble view, this termination decision taken by IBM was illegal and IBM should have never taken this unilateral action to prematurely end my international assignment without any notice whatsoever. **International assignees need to be protected by the company they work for because of the personal sacrifice they make in living and working in another country.**

**3)** It's noteworthy that the decision to finally take up this international assignment based in China was an extremely difficult and challenging one for me personally given the fact that I had to leave my wife and two sons since they could not accompany me because of the potential disruption in their respective lives.

**4)** I expected IBM to try and help me with finding another comparable job in the US organization on my return to the USA by giving me adequate notice. I firmly believe this was a condition on my acceptance of taking up this international assignment. May I add, I felt abandoned and isolated since no one in management tried to help me in landing a new job as they should have.

**It's now crystal clear to me that the reason no one from management offered any support to me was because the directive to fire us came directly from Ginni and her seniors leadership team.**

I relocated back to the USA in March 2014. I was then terminated by IBM in May 2014. I then filed a discrimination case against IBM with the EEOC (NY Office) on September 10, 2014. I opted for a negotiated settlement, rather than sue the company. **In retrospect this was a wrong decision I had taken.** With the EEOC mediation, I signed a separation agreement with IBM later that year under duress by their legal representative who wanted to significantly reduce the financial settlement amount given the merits of my strong discrimination case against IBM. Their legal representative took emotional advantage of me given the fact that I was unemployed for several months after being forced to leave IBM. **IBM's legal representative openly admitted that IBM lacked documentation and a relevant paper trail to support their termination decision.** As such, I had no choice but to accept their severance offer which was a pittance given the strength of my age discrimination case against the company. The financial settlement I signed off was just equivalent to my severance pay due based on my years of service. Nothing more. As such, I do not regard this as a financial settlement reflective of my age discrimination complaint against IBM as well as they **It's** broke the law in the sudden and abrupt elimination of my international assignment. **It's**

noteworthy that I was the only member of my global team which was fired. It is only after I left IBM that several individual law suits as well as class action lawsuits were filed against IBM for **'Age'** discrimination. Now, I understand it was because of a deliberate Age discrimination policy which adversely impacted about twenty thousand men, the majority on IBM's US payroll. My EEOC Charge Number is: **520-2014-01429.**

Over the past couple of years including this year (April 2020), I read with sustained interest in the media of several class action lawsuits as well as individual lawsuits (see attached) of ex-IBM employees with one common theme i.e **"IBM had a stated but hidden policy to fire approx 20,000 men above the age of 40 years irrespective of their performance and contribution. As I understand it the majority of these "firings' took place in the USA. IBM was not in compliance with some government regulations regarding this massive gender retrenchment (see attached articles).** I was 58 years old, when I was asked to leave IBM. It's noteworthy that my performance was never a criteria and justification for IBM to terminate my services abruptly and I am sure that was the case of most of the other unfortunate male employees in the USA. Management wanted to replace older men on their payroll by millennials who they would pay much lower salaries. It is my understanding that IBM firmly believed that they would be able to recruit the equivalent of three millennials to one mature and aged professional currently employed with them - like myself irrespective of their performance and contribution to the company. I have taken the liberty to attach some relevant articles on the age discrimination class action lawsuits as well individual law suits in support of my Age discrimination case against IBM Corporation.

Unfortunately, I am now predisposed for **Alzheimer's Disease and Moderate Dementia** given my memory loss diagnosis in January 2017 (medical reports attached). I was also diagnosed with three blocked arteries in June 2018. My cardiac surgeons at Emory hospital in Atlanta, GA strongly recommended that I undergo **"open heart surgery".** I was also diagnosed with **Diabetes (Type 2) and Hypertension** thirty five years ago. I am therefore a very **rich** target for **COVID-19** given my age of **64** years. I have been unemployed since December 2018. My only source of income is social security. My dependents are my wife, my son and my two grand-kids **(13 & 14 years)** respectively. As such, I need the NY Southern district court to assign legal representation for me. I have tried my best to engage a third party law firm. This has proved as an exercise in futility.

Against the above background, I would like my separation agreement I signed in 2014 to be declared **"null"** and **"void"** by the NY district court and that IBM compensates me for full damages to my professional reputation, credibility through systemic **"Age"**

discrimination perpetrated against me as well as the economic hardships I faced as a consequence of their age discrimination and abrupt termination of my international assignment without finding me a suitable position in my home country (USA). As I highlighted above, I would like to legally challenge IBM's decision to abruptly terminate me whilst I was executing an international assignment based in Beijing, China. It's noteworthy that I have worked with several global technology and consulting companies including **Teradata, HP, IBM, Microsoft & KPMG Peat Marwick**. I have never been the target of deliberate **Age** discrimination save and except from IBM Corporation. In addition, I was never **"fired"** from any company during my rewarding career. Kindly let me know if you require any additional information or clarification. I look forward to the Southern District court seeking final justice and financial compensation on my behalf. Thanks in advance for your ongoing support. Best wishes & stay safe during this pandemic. We are all in this together. Best wishes.

Sincerely - **Earl James Gobin**

**Contact Information:-**

**Address: 4386 Cedar Wood Drive SW, Lilburn GA, 30047**

**Email: eagobin001@gmail.com**

**Mobile: 678-849-2576**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY 10004-2112
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
New York Status Line: (866) 408-8075
New York Direct Dial: (212) 336-3620
TTY (212) 336-3622
FAX (212) 336-3625
Website: www.eeoc.gov

Earl Gobin
4386 Cedar Wood Drive, S.W.
Lilburn, G.A. 30047

Re:  Earl Gobin v. IBM
EEOC Charge No.  520-2014-01429

Dear Mr. Gobin:

In reference to your Intake Questionnaire you filed with our office, enclosed is your Charge of Discrimination (form 5) with your allegations attached.  Please review the Charge of Discrimination (form 5) and the allegations and make any changes or corrections you deem necessary.  Upon completion of your review, sign, date and have the Charge of Discrimination (form 5) notarized and mail to our office at U.S. EEOC, 33 Whitehall Street, 5ᵗʰ Floor, New York, New York 10004, Attn:  Investigator Plummer not later than July 11, 2014.

If we do not receive the signed, dated and notarized Charge of Discrimination (form 5) not later than July 11, 2014, we will infer that you no longer wish to pursue this matter and will issue you a Dismissal and Notice of Right to Sue.

If you have any questions call Investigator Plummer at (212) 336-3767.

Sincerely,

Rodney E. Plummer
Federal Investigator

6/11/14
Date



**U.S. Equal Employment Opportunity Commission**
**New York District Office**

33 Whitehall Street
5th Floor
New York, NY 10004
(212) 336-3620
TDD: 1-800-669-6820
Fax: (212) 336-3625
1-800-669-4000

Respondent: IBM
EEOC Charge No.: 520-2014-01429
FEPA Charge No.:

September 10, 2014

Earl James Gobin
4386 Cedar Wood Drive Sw
Lilburn, GA 30047

Dear Mr. Gobin:

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge. The information provided indicates that the charge is subject to:

[ X ]  Title VII of the Civil Rights Act of 1964 (Title VII)
[ ]  The Age Discrimination in Employment Act (ADEA)
[ ]  The Americans with Disabilities Act (ADA)
[ ]  The Equal Pay Act (EPA)
[ ]  The Genetic Information Nondiscrimination Act (GINA)

You need do nothing further at this time. We will contact you when we need more information or assistance. A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

Please be aware that we will send a copy of the charge to New York State Division Of Human Rights Federal Contract Unit One Fordham Plaza, 4 Fl. Bronx, NY 10458 as required by our procedures. If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official. Then the agency will investigate and resolve the charge under their statute. If this occurs, section 1601.76 of EEOC's regulations entitles you to ask us to perform a Substantial Weight Review of the agency's final finding. To obtain this review, a written request must be made to this office within 15 days of receipt of the agency's final finding in the case. Otherwise, we will generally adopt the agency's finding as EEOC's.

While your charge is pending, please notify us of any change in your address, or where you can be reached if you have any prolonged absence from home. Your cooperation in this matter is essential.

Sincerely,

Christopher Kwok
ADR Coordinator
(212) 336-3762

Enclosure(s)

cc:

Emory Healthcare-Confidential Document
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - TEC_00052337934

NEURO NTE
* Final Report *

| | |
|---|---|
| Document Type: | NEURO NTE |
| Document Date: | January 04, 2017 16:05 |
| Document Status: | Auth (Verified) |
| Document Title: | Stroke clinic new patient visit |
| Performed By: | Rangaraju, Srikant on January 04, 2017 16:06 |
| Verified By: | Rangaraju, Srikant on January 10, 2017 21:16 |
| Encounter info: | 37140103, TEC, TEC Visit, 1/4/2017 - 1/4/2017 |

## * Final Report *

**Subjective**
Mr Gobin is a 60 yo right handed gentleman who works for Microsoft, with h/o HTN, DM (on metformin and glimepiride), self-referred to us after an episode of disorientation and confusion on 12/16/16 that lasted about 1-2 hours. On 12/16/16: 930 AM he went up the stairs after a work related conference call, felt disoriented, went down stairs, sat down and then felt that her lost 20-30 min of time, was then able to recall most of this.
Since this event, he has been feeling more sleepy and tired, memory has not been as sharp following this event.
He has also become short tempered.
No h/o palpitations or chest pain.

**Personal history:**
Graduate degree
No drug use, non-smoker (quit at age 18 yrs), alcohol: 1-2 glasses of wine few times a month
Also uses Doxylamine at night.

**Family history:**
Father: deceased, age 50, cirrhosis and hepatic coma
Mother: COPD from smoking
Brother: CAD, s/p triple bypass

Review of Systems
**Constitutional:** no weight loss. Night sweats +, Tingling of the toes, , blackouts+, mood swings +
**HEENT :**unremarkable
**Thyroid:** no evidence of hyper or hypothyroidism
**Chest:** denies cough bronchitis pneumonia emphysema
**Cardiac:** denies history of rheumatic fever or valvular heart disease ; no symptoms to report
**Abdomen:** denies history of hematemesis melena or hematochezia
**Genitourinary:** denies permanent frequency dysuria
**Extremities:** denies lower extremity edema
**Neurological:** As in HPI

**Objective**

Vitals & Measurements
**HR:** 96  **RR:** 16  **BP:** 132/88  **WT:** 70.9 kg  **BMI:** 23.8

Physical Exam
**HEENT :** Unremarkable
**Thyroid :** Not enlarged

Printed by: Farmer, Paula J.
Printed on: 06/10/2020 13:11

Page 1

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - TEC_00052337934

NEURO NTE
* Final Report *

**Neck Veins:** Not elevated
**Carotids:** Normal;no bruits
**Cardiac:** Regular rate and rhythm;No murmurs,rubs or gallops
**Chest:** Clear; no wheezes or crackles
**Abdomen:** No hepatosplenomegaly or Ascites
**Legs:** No edema

**Neuro:**
MS: AAOx4, fluent speech, repetition and naming intact, follows commands No dysarthria
CN: VFFTC, EOMI, no nystagmus LT/PP intact bilat, face symmetric, hearing intact to voice, palate elev and shoulder shrug symmetric, TPM
MOTOR: nl bulk and tone, 5/5 x A4E, no drift
SENSORY: LT/PP and proprioception intact x A4E. No extinction.
COORD: FNF/HTS intact bilaterally
REFLEXES: 2+ throughout, toes downgoing bilat
GAIT: normal base and stride, normal tandem, neg rhomberg

NIHSS: 0

**mRS today:0**

Lab Results
TSH 2.1
Renal function normal
LDL 140
HDL 57

Diagnostic Results
none to review

**Assessment/Plan**
Acute confusion R41.0
    Favor TGA over TIA or complex partial seizure.
    Will obtain brain MRI and MRA head/neck wo contrast
    LDL 140, recommend statin therapy with goal LDL < 100 if MRI suggestive of prior strokes or large vessel pathology to support a TIA
    Routine EEG ordered although complex partial seizures less favored.
    Continue ASA 81 mg daily for now
    BP at goal.
    Stroke symptoms and FAST discussed.
    Counseled that TGA is less likely to recur. At this stage (>4 weeks from event), MRI is less likely to show any hippocampal changes as may been seen in acute imaging of TGA patients.

    Follow up with me in 1-2 weeks after MRI is completed.
    Ordered:   EEG, Routine (Request)

Brain TIA G45.9
    Ordered:   EEG, Routine (Request)
               MRA Head w + w/o Contrast (Request)
               MRA Neck w/o Contrast (Request)
               MRI Brain w/o Contrast (Request)

Printed by: Farmer, Paula J.
Printed on: 06/10/2020 13:11

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information.  Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - TEC_00052337934

NEURO NTE
* Final Report *

**Signature Line**
Electronically Signed by: Rangaraju, Srikant, MD on 01.10.17.09:16 PM

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - TEC_00052337934

NEURO NTE
* Final Report *

| | |
|---|---|
| Document Type: | NEURO NTE |
| Document Date: | February 01, 2017 14:57 |
| Document Status: | Auth (Verified) |
| Document Title: | Stroke Clinic followup |
| Performed By: | Rangaraju, Srikant on February 01, 2017 14:58 |
| Verified By: | Rangaraju, Srikant on February 01, 2017 14:58 |
| Encounter info: | 37301261, TEC, TEC Visit, 2/1/2017 - 2/1/2017 |

# * Final Report *

### Subjective
Last clinic visit: 1/8/17

Mr Gobin is a 60 yo right handed gentleman who works for Microsoft, with h/o HTN, DM (on metformin and glimepiride), self-referred to us after an episode of disorientation and confusion on 12/16/16 that lasted about 1-2 hours. On 12/16/16: 930 AM he went up the stairs after a work related conference call, felt disoriented, went down stairs, sat down and then felt that her lost 20-30 min of time, was then able to recall most of this.
Since this event, he has been feeling more sleepy and tired, memory has not been as sharp following this event.
He has also become short tempered.
No h/o palpitations or chest pain.

We suspected TGA and ordered an MRI and MRA of the brain and neck, both of which were normal with the exception of mild scattered white matter disease.
No other events since.
He is otherwise doing very well.

### Review of Systems
**Constitutional:** no weight loss
**HEENT :**unremarkable
**Thyroid:** no evidence of hyper or hypothyroidism
**Chest:** denies cough bronchitis pneumonia emphysema
**Cardiac:** denies history of rheumatic fever or valvular heart disease ; no symptoms to report
**Abdomen:** denies history of hematemesis melena or hematochezia
**Genitourinary:** denies permanent frequency dysuria
**Extremities:** denies lower extremity edema
**Neurological:** As in HPI

### Objective

##### Vitals & Measurements
**HR:** 105  **RR:** 14  **BP:** 152/95  **WT:** 70.5 kg  **BMI:** 23.6

##### Physical Exam
Limited exam:
Awake, alert, normal comprehension.

Printed by: Farmer, Paula J.
Printed on: 06/10/2020 13:10

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

NEURO NTE                                                    GOBIN, EARL J - TEC_00052337934
* Final Report *

No facial asymmetry.
Gait normal.

Diagnostic Results
personally reviewed MRI and MRA scans

**Assessment/Plan**
1) TGA: single episode
No further work up needed at this time.
Will skip a routine EEG at this time since yield is very low.
Continue ASA 81, and focus on HTN and DM management through his PCP

Safe to discharge from clinic, with plan to follow up prn

**Signature Line**
Electronically Signed by: Rangaraju, Srikant, MD on 02.01.17.02:58 PM

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - EUH_01233276

History and Physical Hospital
* Final Report *

| | |
|---|---|
| Document Type: | History and Physical Hospital |
| Document Date: | June 26, 2018 18:02 |
| Document Status: | Auth (Verified) |
| Document Title: | History and Physical |
| Performed By: | WILSON, ROBERT O on July 10, 2018 18:05 |
| Verified By: | Rab, Syed Tanveer on July 11, 2018 11:59 |
| Encounter info: | 54494368145, EUH, Single Visit OP, 6/26/2018 - 6/26/2018 |

# * Final Report *

## History of Present Illness
62 yo male Cardiology patient of Dr. Isiadinso, who has had progressive chest pain and an abnormal ST. LHC by Dr. showed multi vessel CAD and patient was referred for CABG. He elected to proceed for PCI and presents today for PCI to LAD and D2.

## LHC 05/24/2018:

### Selective coronary angiography:
Right dominant
Lt ot Rt  collaterals

LM: LI
LAD: proximal 30%, mid 60% (iFR 0.70, FFR 0.80), proximal D2  60-70% (FFR 0.77)
LCx: proximal OM2 90%, small OM2
RCA: dominant, 100% ostial occlusion
RI: ostial 30%

### Left heart catheterization:
LVEDP: 5  mmHg
EF60%
No gradient noted upon pullback.

## Review of Systems
A 14-point ROS was negative except as noted in HPI.
### Physical Exam
#### Vitals & Measurements
**HR:** 94  **RR:** 16  **BP:** 145/95  **SpO2:** 98%  **WT:** 71.4 kg  **BMI:** 24.6
GENERAL:No acute distress.
HEENT: Extraocular movements intact. No JVD or carotid bruit. Carotid pulse normal bilaterally.
CARDIOVASCULAR: S1 and S2 are normal with regular rate and rhythm. No murmurs, ectopy, gallops or rubs.
PULMONARY: Clear bilaterally.
GASTROINTESTINAL: Soft, nontender and nondistended. Bowel sounds noted.
MUSCULOSKELETAL: Moves all 4 extremities without difficulty.

## Problem List/Past Medical History
**Ongoing**
  **Diabetes mellitus**
  **HTN (hypertension)**
Historical
  No qualifying data
## Procedure History
**none**  - Date:

## Medications
  aspirin
  glimepiride, PO, qDay
  Jardiance, PO, qAM
  lisinopril, PO, qDay
  magnesium oxide, PO, **Not taking, unknown reasons**
  metFORMIN, PO, **Not taking, see comments**
  multivitamin, qDay
  sleep aid, **Not taking, unknown reasons**
  Vitamin C, qDay, **Not taking, unknown reasons**
  Vitamin D3, **Not taking, unknown reasons**
## Allergies
No known allergies
## Social History
  Alcohol Use
  Current, Beer, Liquor, Wine, Occasionally, 1 -3 glasses
  Education
  Graduate school or above
  Physical Activity
  Denies
  Recreational Drug Use

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - EUH_01233276

History and Physical Hospital
* Final Report *

SKIN: Clean, dry and intact. No edema
PSYCHIATRIC:Appropriate affect
NEUROLOGIC: No focal deficits
**Assessment/Plan**

1). Further cardiac evaluation including LHC + PCI

No
Tobacco Use / Exposure
 Former smoker, No, Cigarettes, 40
yrs ago
 Travel
 Denies
**Family History**
 CAD (coronary artery disease) 29-
AUG-2014 16:42:07<$>: Sibling (Dx
at 55 years).
 COPD (chronic obstructive
pulmonary disease): Mother.
 Diabetes mellitus: P, Grandmother
and Sibling.

**ECG**
NSR with inferior infarct.

**Signature Line**
Electronically Signed by: WILSON, ROBERT O, PA on 07.10.18.06:05 PM
Co-signed by: Rab, Syed Tanveer, MD on 07.11.18.11:59 AM

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J – TEC_00052337934

CARDS NTE
* Final Report *

| | |
|---|---|
| Document Type: | CARDS NTE |
| Document Date: | July 10, 2018 13:52 |
| Document Status: | Auth (Verified) |
| Document Title: | Office Visit Note |
| Performed By: | Isiadinso, Ijeoma on July 10, 2018 13:56 |
| Verified By: | Isiadinso, Ijeoma on July 10, 2018 15:21 |
| Encounter info: | 41646854, TEC, TEC Visit, 7/10/2018 – 7/10/2018 |

# * Final Report *

## Visit Information
No referring provider documented

## Chief Complaint
follow up stents
Emory heart Center at Eastside

## History of Present Illness
62 yo male returns for follow-up. He underwent left heart catheterization and 5/24/18 and then returned for coronary PCI 6/26/18 with drug-eluting stent placed to mid–LAD and second diagonal artery. He had a chronically occluded RCA. He was initially referred for CABG, but opted for percutaneous intervention. He has done well since that procedure and had significant reduction in exertional left arm pain. No CP. He actually will be traveling this weekend and will monitor for any symptoms. Recall that his anginal symptoms were left arm pain with exertion primarily when walking through airports. Denies any orthopnea, PND or dyspnea. He is interested in cardiac rehabilitation.

## Review of Systems
A 10-point ROS was negative except as noted in HPI

## Physical Exam
### Vitals & Measurements
**HR:** 70  **BP:** 127/79
**HT:** 170.2 cm  **WT:** 71.5 kg  **BMI:** 24.7
GENERAL:No acute distress.
HEENT: Extraocular movements intact. No JVD or carotid bruit. Carotid pulse normal bilaterally.
CARDIOVASCULAR: S1 and S2 are normal with regular rate and rhythm. No murmurs, ectopy, gallops or rubs.
PULMONARY: Clear bilaterally.
GASTROINTESTINAL: Soft, nontender and nondistended. Bowel sounds noted.
MUSCULOSKELETAL: Moves all 4 extremities without difficulty.
SKIN: Clean, dry and intact. No edema

## Problem List/Past Medical History
Ongoing
  **Diabetes mellitus**
  **HTN (hypertension)**
Historical
  No qualifying data

## Procedure History
**none**  - Date:

## Medications
aspirin 81 mg oral tablet, 81 mg, 1 tab (s), PO, qDay, 3 refills
glimepiride, PO, qDay
Jardiance, PO, qAM
Lipitor 40 mg oral tablet, 40 mg, 1 tab (s), PO, qDay, 2 refills
lisinopril, PO, qDay
magnesium oxide, PO
metFORMIN, PO
metoprolol succinate 50 mg oral tablet, extended release, 50 mg, 1 tab(s), PO, qDay, 3 refills
multivitamin, qDay
nitroglycerin 0.4 mg sublingual tablet, 0.4 mg, 1 tab(s), SL, PRN, PRN
Plavix 75 mg oral tablet, 75 mg, 1 tab (s), PO, qDay, 3 refills
Vitamin C, qDay
Vitamin D3

## Allergies
No known allergies

## Social History
Alcohol Use

**Emory Healthcare-Confidential Document**

This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - TEC_00052337934

CARDS NTE
* Final Report *

PSYCHIATRIC:Appropriate affect
NEUROLOGIC: No focal deficits

### Assessment/Plan

CAD (coronary artery disease) I25.10
   Significantly improved symptoms.  He'll monitor for any recurrence.
   Continue optimal medical therapy especially in light of chronically occluded RCA.
   He will return for an ETT prior to referral to cardiac rehabilitation at Eastside
   Medical Center.
   He needs a repeat fasting lipid panel which I have ordered.
   Ordered:  Chemistry Profile Lipid
             Exercise Tolerance Test (Request)

HTN (hypertension) I10
   Blood pressure controlled.  Continue current meds.

Orders:
   metoPROLOL, = 1 tab(s) 50 mg, PO, qDay, # 90 tab(s), 3 Refill(s), Substitution
   Allowed, Pharmacy: Walmart Pharmacy 1373, 1 tab(s) PO qDay

Follow-up in 4 months.

### Additional Clinical Information

This note was dictated using voice recognition software. As a result, transcription errors or inaccuracies may be present.

Current, Beer, Liquor, Wine,
   Occasionally, 1 -3 glasses
Education
   Graduate school or above
Physical Activity
   Denies
Recreational Drug Use
   No
Tobacco Use / Exposure
   Former smoker, No, Cigarettes, 40
   yrs ago
Travel
   Denies

### Family History

CAD (coronary artery disease) 29-AUG-
   2014 16:42:07<$>: Sibling (Dx at 55
   years).
COPD (chronic obstructive pulmonary
   disease): Mother.
Diabetes mellitus: P, Grandmother and
   Sibling.

### Lab Results

Sodium Level 142 mmol/L 06/26/2018
11:42
Potassium Level 4.0 mmol/L 06/26/2018
11:42
Chloride Level 106 mmol/L 06/26/2018
11:42
Carbon Dioxide Level 27 mmol/L
06/26/2018 11:42
Glucose 191 mg/dL 06/26/2018 11:42
(High)
Blood Urea Nitrogen 13 mg/dL
06/26/2018 11:42
Creatinine 0.93 mg/dL 06/26/2018 11:42
Calcium Level Total 9.8 mg/dL
06/26/2018 11:42
Hemoglobin A1C 7.4 % 05/16/2018 15:20
(High)
Cholesterol Level Total 247 mg/dL
05/16/2018 15:20 (High)
Triglyceride 232 mg/dL 05/16/2018 15:20
(High)
HDL Cholesterol 59 mg/dL 05/16/2018
15:20
LDL Cholesterol 142 mg/dL 05/16/2018
15:20 (High)
White Blood Count 6.8 10E3/mcL
06/26/2018 11:42

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - TEC_00052337934

CARDS NTE
* Final Report *

Hemoglobin 15.8 gm/dL 06/26/2018 11:42
Platelet Count 118 10E3/mcL 06/26/2018 11:42 (Low)

**Diagnostic Results**
 Cardiac catheterization 5/24/18:
      LM: LI
LAD: proximal 30%, mid 60% (iFR 0.70, FFR 0.80), proximal D2 60-70% (FFR 0.77)
LCx: proximal OM2 90%, small OM2
RCA: dominant, 100% ostial occlusion
RI: ostial 30%
LVEDP: 5 mmHg
EF60%[1]

**coronary PCI 6/26/18 with drug-eluting stent placed to mid-LAD and second diagonal artery**

[1] Left Heart Cath (LHC) only™ _SR; Ratanapo, Supawat 05/24/2018 19:04

**Signature Line**
Electronically Signed by: Isiadinso, Ijeoma, MD on 07.10.18.03:21 PM

**Emory Healthcare-Confidential Document**
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - TEC_00052337934

CARDS NTE
* Final Report *

| | |
|---|---|
| Document Type: | CARDS NTE |
| Document Date: | July 30, 2019 10:30 |
| Document Status: | Auth (Verified) |
| Document Title: | Office Visit Note |
| Performed By: | Isiadinso, Ijeoma on July 30, 2019 10:31 |
| Verified By: | Isiadinso, Ijeoma on July 30, 2019 12:29 |
| Encounter info: | 45125229, TEC, TEC Visit, 7/30/2019 - 7/30/2019 |

## * Final Report *

**Visit Information**
**Referring Provider:** Robbins, Lisa

**Chief Complaint**
1 year
Emory heart Center at Eastside

**History of Present Illness**
63-year-old male with CAD, s/p PCI to mid LAD and D2 last year and was also found to have a chronically occluded RCA as well as 90% stenosis of a small left circumflex artery. He is here for follow-up. He reports occasional left upper arm pain which is his anginal equivalent, with activity. These symptoms have been present since last year, but states it is nowhere near his previous anginal sxs. The pain resolves also within a few minutes. He has not taken any nitroglycerin for this.

**Review of Systems**
A 10-point ROS was negative except as noted in HPI

**Physical Exam**
Vitals & Measurements
**HR:** 64 **BP:** 119/80
**HT:** 170.2 cm **WT:** 70.6 kg **BMI:** 24.4
GENERAL:No acute distress.
HEENT: Extraocular movements intact. No JVD or carotid bruit. Carotid pulse normal bilaterally.
CARDIOVASCULAR: S1 and S2 are normal with regular rate and rhythm. No murmurs, ectopy, gallops or rubs.
PULMONARY: Clear bilaterally.
GASTROINTESTINAL: Soft, nontender and nondistended. Bowel sounds noted.
MUSCULOSKELETAL: Moves all 4 extremities without difficulty.
SKIN: Clean, dry and intact. No edema

**Problem List/Past Medical History**
Ongoing
CAD (coronary artery disease) Comments: coronary PCI 6/26/18 with drug-eluting stent placed to mid-LAD and second diagonal artery
Diabetes mellitus
HTN (hypertension)
Historical
No qualifying data

**Procedure History**
**none** - Date:

**Medications**
aspirin 81 mg oral tablet, 81 mg= 1 tab (s), PO, qDay, 3 refills
glimepiride, 4 mg, PO, qDay
isosorbide mononitrate 30 mg oral tablet, extended release, 30 mg= 1 tab(s), PO, qAM, 3 refills
Jardiance, 10 mg, PO, qDay
Lipitor 40 mg oral tablet, 40 mg= 1 tab (s), PO, qDay, 1 refills
lisinopril, 20 mg, PO, qDay
magnesium oxide, PO
metFORMIN, 1000 mg, PO, BID
metoprolol succinate 50 mg oral tablet, extended release, 50 mg= 1 tab(s), PO, qDay, 3 refills
multivitamin, qDay
nitroglycerin 0.4 mg sublingual tablet, 0.4 mg= 1 tab(s), SL, PRN, PRN
Plavix 75 mg oral tablet, 75 mg= 1 tab (s), PO, qDay, 3 refills
Vitamin C, qDay
Vitamin D3

Printed by: Farmer, Paula J.
Printed on: 06/10/2020 16:31

Emory Healthcare-Confidential Document
This information is subject to all Federal and State laws regarding confidentiality and privacy and to the policies and procedures of Emory Healthcare regarding patient information. Any unauthorized use, disclosure, or reproduction of this information is strictly prohibited.

GOBIN, EARL J - TEC_00052337934

CARDS NTE
* Final Report *

PSYCHIATRIC: Appropriate affect
NEUROLOGIC: No focal deficits

**Assessment/Plan**
CAD (coronary artery disease) I25.10
 Status post coronary PCI with DES ×2 to mid LAD and D2. He has residual non-revascularizable disease in the RCA and left circumflex. We will add isosorbide mononitrate. Continue dual antiplatelet therapy, statin and BB. Educated patient on the use of sublingual nitroglycerin. If there is any increase in frequency of symptoms, we will discuss repeat stress testing. He is scheduled for his annual physical and labs with his PCP next week he will have them fax a copy of his lab results to us.
 Ordered:  clopidogrel, 75 mg = 1 tab(s), PO, qDay, # 90 tab(s), 3 Refill(s), Substitution Allowed, Pharmacy: Walmart Pharmacy 1373, 1 tab(s) PO qDay

HTN (hypertension) I10
 Controlled. I have lowered athe dose of lisinopril to 10 mg to allow for addition of Imdur.

 Orders:
 isosorbide mononitrate, = 1 tab(s) 30 mg, PO, qAM, # 90 tab(s), 3 Refill(s), Substitution Allowed, Pharmacy: Walmart Pharmacy 1373, 1 tab(s) PO qAM
 lisinopril, 10 mg = 1 tab(s), PO, qDay, # 90 tab(s), 3 Refill(s), Substitution Allowed, Pharmacy: Walmart Pharmacy 1373, 1 tab(s) PO qDay
 metoPROLOL, = 1 tab(s) 50 mg, PO, qDay, # 90 tab(s), 3 Refill(s), Substitution Allowed, Pharmacy: Walmart Pharmacy 1373, 1 tab(s) PO qDay
 nitroglycerin, 0.4 mg = 1 tab(s), SL, PRN, PRN chest pain, # 100 tab(s), 5 Refill (s), Substitution Allowed, Pharmacy: Walmart Pharmacy 1373, 1 tab(s) SL, PRN, x30 day(s), PRN: chest pain

Follow-up in 6 months.
**Additional Clinical Information**
cc: Robbins, Lisa

**Allergies**
No known allergies
**Social History**
 Alcohol Use - 01/04/2017
  Current, Beer, Liquor, Wine, Occasionally, 1 -3 glasses
 Education - 01/04/2017
  Graduate school or above
 Physical Activity - 01/04/2017
  Denies
 Recreational Drug Use - 01/04/2017
  No
 Tobacco Use / Exposure - 01/04/2017
  Former smoker, No, Cigarettes, 40 yrs ago
 Travel - 01/04/2017
  Denies

**Family History**
 CAD (coronary artery disease) 29-AUG-2014 16:42:07<$>: Sibling (Dx at 55 years).
 COPD (chronic obstructive pulmonary disease): Mother.
 Diabetes mellitus: P, Grandmother and Sibling.

**Lab Results**
 2/2019: Normal CMP. HbA1c 8.9. Vitamin D 19. Lipoprotein a 149. TC 151, TG 171, HDL 49, LDL 68.

**Diagnostic Results**
Cardiac catheterization 5/24/18:
LM: LI
LAD: proximal 30%, mid 60% (iFR 0.70, FFR 0.80), proximal D2 60-70% (FFR 0.77)
LCx: proximal OM2 90%, small OM2
RCA: dominant, 100% ostial occlusion
RI: ostial 30%
LVEDP: 5 mmHg
EF 60% [1]

coronary PCI 6/26/18 with drug-eluting stent placed to mid-LAD and second diagonal artery [1]

[1] Office Visit Note; Isiadinso, Ijeoma 07/10/2018 13:52

**Signature Line**

Printed by: Farmer, Paula J.
Printed on: 06/10/2020 16:31

6/19/2020

# COHENMILSTEIN

PRACTICE AREA:   CIVIL RIGHTS & EMPLOYMENT

# IBM Age Discrimination Litigation: Estle, et al. v. International Business Machines Corporation

*If you were terminated by IBM as a part of a group termination when you were age 40 or older and you would like to join this action as a party claimant, please review, complete, and submit the IBM Age Discrimination Questionnaire accessible here.*

On March 27, 2019, Cohen Milstein and Johnson, Webbert & Young, LLP, on behalf of former employees of IBM Corporation, filed an age discrimination class action against the tech giant in U.S. District Court for the Southern District of New York (White Plains) for violating the federal laws prohibiting age discrimination, including the Older Workers Benefit Protection Act (OWBPA) and the Age Discrimination in Employment Act (ADEA).

The plaintiffs bringing the class action are all over age 55 and were terminated by IBM in 2016 in one of its "Resource Actions."  They are just four of over 20,000 IBM employees over the age of 40 who have been discharged from IBM during the past six years.

## Case Background

Plaintiffs allege that in 2014 IBM began implementing a company-wide plan, hatched by top executives, to illegally conceal evidence of its large-scale discriminatory layoffs—called "Resource Actions"—that eliminated older employees in favor of much younger ones.

Also in 2014, plaintiffs allege, IBM made an intentional decision to begin concealing information about the layoff demographics as required by the OWBPA. Contrary to its past practices, IBM began asking laid-off workers to release their right, under the ADEA, to bring age discrimination claims collectively as a group without providing any of the "minimum" evidence explicitly required by the OWBPA. Plaintiffs further allege that IBM also coerced laid-off workers to sign arbitration agreements, waiving their federally-protected rights to bring ADEA claims in court.

The OWBPA protects older workers from unfair coercion and manipulation when they are laid off and offered severance packages in return for the release of their rights to bring age discrimination claims under the ADEA. One key protection is that the employer cannot obtain a valid release from a group of laid-off workers of their rights under the ADEA without first providing them with critical comparator evidence of possible age discrimination in the layoff selection process.

The OWBPA mandates without exception disclosures including "any eligibility factors" for the layoff, as well as the ages and job titles of everyone in their unit who lost their job and everyone in their unit who was spared. Congress determined this "minimum" information was essential for employees to knowingly evaluate whether the layoff "may be designed to remove older workers from the labor force."

6/19/2020        IBM Age Discrimination Litigation: Estle, et al. v. International Business Machines Corporation l Cohen Milstein

Plaintiffs allege that IBM took the calculated risk of openly breaking the law to cover up its massive layoffs of older workers, which were designed to "correct" its "seniority mix" by replacing baby boomers with what it called "early professional hires." This effort was the culmination of its internal reviews that stereotyped older workers as rigid and unreceptive to technology, and branded millennial employees as innovative.

Plaintiffs cite numerous examples of this corporate plan to remove older employees to make way for millennials, including 1) IBM's HR Dep't devised rules making older workers more likely to be selected for Resource Actions. For example, IBM exempted its so-called "early professional hires" and recent college graduates from Resource Actions, and 2) IBM also manipulated the performance review process by directing the reduction of the annual performance ratings for older workers and then using those sham evaluation scores as a key factor to justify picking older workers to be discharged through the Resource Actions.

The lawsuit comes after a bombshell story last summer by ProPublica, "Cutting 'Old Heads' at IBM," which exposed a company-wide pattern of age discrimination practices spanning many units and geographical locations.

While filing their complaint in federal court, asking the court to invalidate their release of their ADEA rights, Plaintiffs are also filing age discrimination claims in arbitration because IBM's Severance Agreement requires them to take all their claims to arbitration.

In addition to seeking to invalidate the illegal waiver of their rights under the ADEA, Plaintiffs seek the issuance of notice to all other similarly situated laid off older employees who were coerced into signing the invalid releases and the certification of their collective claims under the ADEA, as well as declaratory, equitable, and monetary relief.

If you were terminated by IBM as a part of a group termination when you were age 40 or older and you would like to join this action as a party claimant, please review, complete, and submit the IBM Age Discrimination Questionnaire accessible here.

Mail, fax, or email the completed consent form to:

Johnson, Webbert & Young LLP

P.O. Box 79

Augusta, ME 04332

Fax: 207.622.4160

npollock@work.law

CASE DOCUMENTS

S.D.N.Y. Complaint - March 27, 2019

JAMS Complaint - March 27, 2019

IBM Age Discrimination Questionnaire

6/19/2020

## RELATED PROFESSIONALS

Shaylyn Cochran

Joseph M. Sellers

## RELATED NEWS & EVENTS

- IBM Sued for Massive Scheme to Cover Up Discriminatory Layoff of Over 20,000 Older Workers in Knowing Violation of Disclosure Requirements
- "Another Group of Older Ex-Employees Are Suing IBM Alleging It Targeted Older Workers for Layoffs," Business Insider
- "Former IBM Employees Sue Company in Federal Age-Discrimination Lawsuit," New York Law Journal
- "Former IBM Employees Sue Over Alleged Age Discrimination," PressFrom
- "IBM Accused of Violating Federal Anti-Age Discrimination Law," ProPublica
- "IBM Faces New Age Discrimination Lawsuit for Targeting 'Gray Hairs,'" Dice Insights
- "IBM Schemed to Hide Age Bias in Layoffs, Ex-Workers Say," Law360
- "IBM Sued for Age Discrimination," Longmont Times-Call

© 2020 Cohen Milstein Sellers & Toll PLLC. All rights reserved.

ATTORNEY ADVERTISING. Prior results do not guarantee a similar outcome.

6/19/2020

LinkedIn 

 Search



#IBM
#VI

Today's news and views

- Floyd protests: Business reacts
  Top news • 16,744 readers
- How companies are reopening
  15m ago • 3,967 readers
- Here's who's hiring right now
  16h ago • 28,577 readers
- Starting a new job while WFH
  16h ago • 22,062 readers
- Pessimists need not apply
  17h ago • 5,032 readers

Show more ⌄

☐ Share

## IBM sued for age discrimination

 By Scott Olster, Editor at LinkedIn

Updated 2 years ago ⓘ

Three former IBM employees have filed a class action lawsuit against the tech giant, claiming that they were subjected to age discrimination when they were fired, according to Bloomberg. The suit, which was filed on Monday in federal court in Manhattan, comes in the wake of an investigation by ProPublica, which reported that IBM had laid off 20,000 employees over the age of 40 over the past six years. IBM claims that its staffing changes were not related to age but rather to its need to hire workers with different skills, as the legacy tech company shifts toward cloud computing and mobile offerings.

A

Get the latest jobs and industry news

 

Earl, explore relevant opportunities \
Diversified.

☐ Follow

About      Accessibility    Help Center
Privacy & Terms ⌄          Ad Choices
Advertising   Business Services ⌄
Get the LinkedIn app         More

LinkedIn  LinkedIn Corporation © 2020

### EDITORS' PICKS

 Jacob Stebbins • 3rd+
Putting the Human back in HCM
1yr • 🌐

First Nike. Now IBM. What do your termination processes say about your company? What type of protection do you have in place to prevent a possible lawsuit?

 **IBM Is Being Sued for Age Discrimination After Firing Thousands**
industryweek.com

👍 499 • 616 Comments

👍 Like    💬 Comment    ↪ Share

 Dave Ngarbingan • 3rd+
Senior Account Manager at Korn Ferry Indonesia
1yr • 🌐

Is the exodus of aging workers a case of discrimination or unconscious bias?

**How IBM quietly pushed out 20,000 aging workers**
vox.com

👍 163 • 275 Comments

👍 Like    💬 Comment    ↪ Share

Sean Simpson • 2nd
Executive Recruiter & Account Manager at Randstad Technologies US
2yr • 🌐

We need to keep fighting against age discrimination!

💬 Messaging

🔍 Search messages  ⚏

 Hannah Mans, MBA
Sponsored • Hannah Mans, M...

 Arvind Krishna
You: Hi Arvind - Good morning. ...

 Mengnan(Nancy) Lu
You: Hi Nancy - Good day@Tha...

1

Human Resource
**Executive**
(https://hrexecutive.com)

# IBM is Being Accused of Widespread Age Discrimination

A former HR leader said that massive layoffs were part of an effort to appeal to millennials.

By: Andrew R. McIlvaine (https://hrexecutive.com/author/andrew-r-mcilvaine/) | August 2, 2019 · 3 min read

Topics: Employment Law (https://hrexecutive.com/category/employmentlaw/) | Issues (https://hrexecutive.com/category/talentmanagement/issues-talentmanagement/) | Talent Acquisition (https://hrexecutive.com/category/talentmanagement/talent-acquisition/) | Talent Management (https://hrexecutive.com/category/talentmanagement/) | Top Stories (https://hrexecutive.com/category/top-stories/)



Former IBM vice president of HR Alan Wild said during a recent court deposition that the company laid off as many as 100,000 employees in recent years as it strove to appear as "cool" and "trendy" as Amazon and Google, reports *Bloomberg* (https://www.bloomberg.com/news/articles/2019-07-31/ibm-fired-as-many-as-100-000-in-recent-years-court-case-shows).

Wild's deposition took place as part of a civil suit filed in Texas by former employee Jonathan Langley, a 61-year-old who claims IBM fired him due to his age after nearly 25 years at the company. Two other individual civil suits accusing the company of age discrimination have been filed in California and Pennsylvania, while a class-action lawsuit against it has been filed in Manhattan, reports *Bloomberg*.

In his deposition, Wild said IBM had "laid off 50,000 to 100,000 employees in just the last several years," according to a court document filed in Texas on Tuesday.

**Human Resource**
**Executive**
(https://hrexecutive.com)

Advertisement



IBM, at one time the nation's dominant technology company, was struggling to catch up to rivals such as Amazon in the cloud computing business and badly needed new tech talent. In his deposition, Wild said the company wanted to show millennial-age talent that it was not "an old fuddy duddy organization" but instead a "cool, trendy organization" like Amazon or Google. Court documents reveal that IBM did that by targeting its older workforce via rolling layoffs over several years, *Bloomberg* reports.

**Read more HERE about how to keep your organization out (http://hrexecutive.com/avoiding-legal-pitfalls/) of legal pitfalls.**

Earlier this year, ProPublica and Mother Jones published a joint investigation that estimated IBM (https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/) has terminated the employment of more than 20,000 American employees over the age of 40 during the past five years. That number accounts for approximately 60 percent of the company's total estimated U.S. job cuts, according to the report.

Advertisement



Here is a statement from IBM Vice President of Corporate Communications Edward Barbini in response to the *Bloomberg* story:

"We have reinvented IBM in the past five years to target higher value opportunities for our clients. As part of this reinvention, we have made major investments in our skills and in new businesses, such as Watson Health, and in people with expertise in critical new areas such as cloud, analytics and quantum and blockchain technologies. We have also transitioned to a less labor-intensive business model and have divested some of our operations. The company hires 50,000 employees each year, and spends nearly a half-billion dollars on training our team. We also receive more than 8,000 job applications every day, the highest rate that we've ever experienced, so there's clear excitement about IBM's strategy and direction for the future."

Andrew R. McIlvaine is former senior editor with *Human Resource Executive*®.

6/19/2020                                          IBM faces age discrimination class action suit



Home  /  Daily News  /  IBM faces age discrimination class action…

LABOR & EMPLOYMENT

# IBM faces age discrimination class action suit

BY JASON TASHEA (HTTPS://WWW.ABAJOURNAL.COM/AUTHORS/64729/)

## SEPTEMBER 19, 2018, 6:05 AM CDT

Like 1    Share      Tweet   in Share 



Shutterstock.com.

/IBM.pdf) filed Monday.

IBM faces a class action lawsuit over age discrimination after firing thousands of American employees.

The suit, filed in U.S. District Court for the Southern District of New York, alleges that IBM fired three plaintiffs because of their age.

"IBM has discriminated, and continues to discriminate, against its older workers, both by laying them off disproportionately to younger workers and by not hiring them for open positions," reads the complaint (https://www.abajournal.com/images/main_images

Relying on reporting from ProPublica (https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/), the plaintiffs allege that starting in 2012 IBM laid off at least 20,000 employees over the age of 40, violating federal and state law in California and North Carolina.

The plaintiffs, all between 55 and 67 years of age, were laid off from IBM last June.

Slow to enter the cloud and mobile technology markets, IBM has been cutting costs and revamping its workforce to remain competitive, Bloomberg (https://www.bloomberg.com/news/articles/2018-09-17/ibm-is-being-sued-for-age-discrimination-after-firing-thousands) reports.

IBM employs around 400,000 people worldwide, with experts estimating fewer than 100,000 are in the U.S., according to the New York Times (https://www.nytimes.com/2017/09/28/technology/ibm-india.html) in a September 2017 article. At the same time, IBM has drastically increased its India operations, which now employs more people than their U.S. counterpart.

"Changes in our workforce are about skills, not age," Ed Barbini, a spokesman for IBM said in a statement published in Fortune (http://fortune.com/2018/09/11/ibm-age-discrimination-lawsuit/). "In fact, since 2010 there is no difference in the age of our U.S. workforce, but the skills profile of our employees has changed dramatically. That is why we have been and will continue investing heavily in employee skills and retraining—to make all of us successful in this new era of technology."

According to the ProPublica article, IBM failed to give older workers information about age bias and had them sign away their right to a later legal action, worked to increase firings and resignations to avoid layoff numbers that could require public disclosure and pushed out older workers only to hire them back as contract workers, which saved money.

In May, a similar case was filed in the U.S. District Court for the Western District of Texas by a 60-year-old former IBM employee who was laid off in June 2017. According to the complaint (https://www.bloomberglaw.com/public/desktop/document/Langley_v_International_Business_Machines_Corporation_Docket_No_1?1527798903), IBM recorded the termination as a resignation and later sent mail to the plaintiff congratulating him on his retirement. The case was not brought as a class action.

This firing occurred at a time when IBM "devoted countless millions of dollars to its effort to rebrand as a hip, Millennial-centric tech company" and cut out workers from the Baby Boomer generation, calling them "gray hairs" and "old heads", according to the complaint. The case is set for a pretrial conference in December.

IBM faces age discrimination class action suit

If the case in New York is certified as a class action, it could cost the company millions, as Michael Willemin, an employment lawyer with Wigdor, told Bloomberg. There are no hearings scheduled yet in the New York case.

*Give us feedback, share a story tip or update, or report an error.*

      

Copyright 2020 American Bar Association. All rights reserved.

## WORK & JOBS (/WORK/)
# Working at 50+
⌄



# IBM Faces Age Discrimination Lawsuit

Company believes layoffs were 'valid and lawful'

by Kenneth Terrell, **AARP (https://www.aarp.org)**, April 3, 2019    |    💬 Comments: 17



GETTY IMAGES

A new lawsuit claims that IBM has violated a key part of a federal law that protects older workers from age discrimination. If successful, the lawsuit could open the tech giant to collective action from thousands of employees it has laid off over the past five years.

IBM maintains it didn't discriminate and says it believes the lawsuit will fail.

Four former IBM workers, who were all in their mid-50s when they were laid off in 2016, filed their lawsuit March 27 in the federal court for the Southern District of New York. They say that in order to get severance packages (/work/on-the-job/info-2017/how-to-negotiate-better-severance-package.html), they had to sign waivers affecting their rights, even though the company didn't give them information about the ages and positions of the employees who were being terminated and those who were retained.

Since 1990, the federal Older Workers Benefit Protection Act (OWBPA) has required employers to disclose this information to workers age 40 and older who are part of a group layoff, along with details about the criteria used to pick employees for discharge. (These disclosures are not required in some cases of voluntary retirement options.) AARP was one of the primary advocates for the OWBPA, which Congress passed in order to help older workers — who often face more difficulty finding new jobs quickly — decide if they might have been victims of discrimination before they sign for a severance package out of economic need.

"For years, IBM has systematically removed older employees from its workforce and concealed from them the information with which they could detect the discriminatory nature of these actions," Joseph M. Sellers, one of the attorneys for the plaintiffs and a partner at Cohen Milstein Sellers & Toll, said in a statement. "IBM — and the technology industry more broadly — cannot push 'baby boomer' employees out the door based on unlawful stereotypes."

**Worried about age discrimination? AARP can help you learn your rights (/work/working-at-50-plus/age-discrimination/)**

The plaintiffs are asking to be released from the waivers and for permission to pursue their claims collectively in arbitration, a request that might allow thousands of former IBM employees to join in. An article by investigative journalism outlet ProPublica (https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/) estimated that over the past six years IBM has let go of more than 20,000 workers in the United States who were at least 40 years old. Workers who signed the waivers believed they were unable to sue collectively, the lawsuit says. Without a collective suit, it is hard for individual workers to bring an age discrimination case because attorneys typically don't find such individual cases worth the cost.

In a statement about the case, IBM said "the plaintiffs' legal theory will fail, as similar cases have, and we are confident IBM's agreements are valid and lawful."

"IBM does not discriminate, and makes its employment decisions based on skills, not age," said Ed Barbini, an IBM spokesman.

According to the lawsuit, in 2014, IBM started working to "correct [its] seniority mix" by removing older workers and replacing them with younger employees, who the company's consulting department said "are generally much more innovative and receptive to technology than baby boomers." At that time, IBM stopped providing older employees who were part of group layoffs with the demographic information required by the OWBPA, the lawsuit says. Instead, the company asked these workers to sign a revised form that didn't force them to waive any potential age discrimination (/work/on-the-job/info-2017/age-discrimination-facts.html) claims but instead required them to pursue these complaints through individual arbitration.

The new lawsuit challenges whether this waiver is valid without the OWBPA information.

When it stopped providing the OWBPA disclosure information in 2014, IBM said the decision was the result of privacy concerns raised by some employees. The company also said then that the individual arbitration requirement in the waiver form was legally valid.

The lawsuit also states that, as part of its efforts to eliminate older employees, IBM supervisors in 2014 began to give the plaintiffs lower scores on their annual reviews.

"I did my job very well and received glowing remarks on my annual evaluations for 33 years," said a statement from Cheryl Witmer of Firestone, Colo., a plaintiff in the complaint who was laid off when she was 57. "Suddenly in my 34th year, I was unfairly downgraded in my annual evaluation. Nothing about my work changed; what changed is that IBM decided to replace me with a much younger worker."

In addition to using the courts to fight incidents of potential age bias, advocates for older workers also are pursuing new legislation. Congress is considering the Protecting Older Workers Against Discrimination Act (/politics-society/advocacy/info-2019/bills-protect-older-workers.html), which would improve their protections.

## More on Age Discrimination

- Age discrimination is common in the workplace, an AARP survey found (/work/working-at-50-plus/info-2018/age-discrimination-common-at-work.html)
- Age bias complaints are rising among women and minorities (/work/working-at-50-plus/info-2018/age-discrimination-increases-women-minorities.html)

## Join the Discussion



💬 17   |   ADD YOURS

‹ WRAL.com    TechWire Partners    TechWire Insiders                    Search                    ⌕

NEWS     STARTUPS     JOBS     EVENTS     PODCAST

# NEWS

## Lawyer seeking more clients for IBM discrimination battle with NC conn

IBM        SHANNON LISS-RIORDAN



*IBM*

by Chantal Allam — April 16, 2020 .

**RALEIGH** – A Texas judge has dismissed an age discrimination case filed by a former IBM employee, suggesting the case has been settled out of court. However, hundreds of similar claims from across the country remain pending, including from North Carolina.

Judge David Ezra in the Texan Western District Court signed a court order on Tuesday closing the case of Jonathan Langley, who filed suit in 2018 after being laid off at the age of 60 after 24 years with the company.

It is believed the two parties have agreed to settle confidentially out of court, according to tech news site The Inquirer in the U.K.

IBM declined to comment.

Lawyer seeking more clients for IBM age discrimination battle with NC connection | WRAL TechWire



NEWS ⌄    STARTUPS ⌄    JOBS ⌄    EVENTS ⌄    PODCAST

# Get the top stories in your inbox every morning

**Email Address**                    SUBMIT

Well-known employment lawyer Shannon Liss-Riordan is currently representing about 150 former IBM employees who are claiming they lost their jobs because of age discrimination. She has vowed that "IBM cannot escape discrimination laws."



Henry Gerrits from his LinkedIn page

That includes Henry Gerrits, 68, from Cary. He worked at IBM from 1985 through June of 2018, according to the lawsuit. He was told he was being laid off on March 29 of last year.

IBM operates one of its largest corporate campuses in RTP and employs several thousand people across North Carolina.

"His case, along with the others, is pending," said Liss-Riordan in an email to WRAL TechWire.

She added: "We're pleased that Jonathan Langley was able to resolve his case."

## CLASS-ACTION LAWSUIT

 **TechWire**

NEWS ⌄    STARTUPS ⌄    JOBS ⌄    EVENTS ⌄    PODCAST

Since then, she said a number of her clients have "opted in to our federal lawsuit," and a number of them are pursuing their claims through individual arbitration.

Meanwhile, Liss-Riordan is still seeking to get the word out to other IBM employees around the country who may have claims and can join our litigation.

"That effort is ongoing; based on a recent order from the court, we will need to engage in discovery to determine the contours of the class for whom we can seek notice," she said.

"We are engaged in discovery in the various arbitrations and plan to take discovery in the court class action next as well."

## Cary resident among 3 IBMers suing Big Blue for age discrimination

Shannon Liss-Riordan, an attorney who has represented workers against Uber, Amazon and Google, on Monday filed an age discrimination suit against IBM. The news comes amid a report that the Equal Employment Opportunity Commission has consolidated other complaints into a single investigation of IBM employment practices.

TW  **WRAL TechWire**                                            0



## 'IBM cannot escape discrimination laws,' says attorney in age bias suit

Well-known employment lawyer Shannon Liss-Riordan believes IBM systematically targeted older workers for layoff to build a younger workforce, flouting rules against age bias – and she's going to prove it.

TW  **WRAL TechWire**                                            0

≡   **wbur**   |   **Here & Now**

# IBM Age Discrimination Case Heads To Court 11:06

⟳  </>

September 03, 2019

A case in which IBM is being accused of age discrimination is heading to a Texas courtroom Wednesday. It is one of a number of similar cases against the IT company. ProPublica and Mother Jones <u>reported</u> last year the company fired more than 20,000 workers over the age of 40, which amounted to around 60% of the job losses at IBM.

*Here & Now*'s Robin Young speaks with ProPublica contributing reporter **Peter Gosselin** (@PeterGosselin), one of the reporters on the story and senior fellow at Hunter College's Brookdale Center on Ageing.

Statement from IBM:

"IBM makes its employment decisions based on skills, not age. In fact, since 2010 there is no difference in the age of our U.S. workforce, but the skills profile has changed dramatically. That is why we have been and will continue investing heavily in employee skills and retraining — to make all of us successful in this new era of technology."

*This segment aired on September 3, 2019.*

Business

# IBM Fired as Many as 100,000 in Recent Years, Lawsuit Shows

By Olivia Carville
July 31, 2019, 3:11 PM EDT
*Updated on  July 31, 2019, 6:03 PM EDT*

▶ Moves were to make IBM appear as 'cool' as Google and Amazon

▶ Big Blue is facing several age-discrimination lawsuits

International Business Machines Corp. has fired as many as 100,000 employees in the last few years in an effort to boost its appeal to millennials and make it appear to be as "cool" and "trendy" as Amazon and Google, according to a deposition from a former vice president in an ongoing age discrimination lawsuit.

The technology company is facing several lawsuits accusing it of firing older workers, including a class-action case in Manhattan and individual civil suits filed in California, Pennsylvania and Texas last year.

"We have reinvented IBM in the past five years to target higher value opportunities for our clients," IBM said in a statement. "The company hires 50,000 employees each year."

Big Blue has struggled with almost seven straight years of shrinking revenue. In the last decade, the company has fired thousands of people in the U.S., Canada and other high-wage jurisdictions in an effort to cut costs and retool its workforce after coming late to the cloud-computing and mobile-tech revolutions. The number of IBM employees has fallen to its lowest point in six years, with 350,600 global workers at the end of 2018 -- a 19% reduction since 2013.

In a deposition in one of the civil cases, Alan Wild, former vice president of human resources, said IBM had "laid off 50,000 to 100,000 employees in just the last several years," according to a court document filed Tuesday in Texas.

In his deposition, Wild said 108-year-old IBM faced talent recruitment problems and determined one way to show millennials that IBM was not "an old fuddy duddy organization" was to make itself appear "as [a] cool, trendy organization" like Alphabet Inc.'s Google and Amazon.com Inc., according to the document. To do that, IBM set out to slough off large portions of its older workforce using rolling layoffs over the course of several years, according to court documents.

This strategy deliberately targeted older workers like the plaintiff, Texas-based Jonathan Langley, 61, who has accused IBM of firing him after more than 24 years because of his age, according to the document. IBM filed a motion to dismiss Langley's case. On Tuesday, his lawyers filed an opposition to that motion.

The opposition included comments from Wild's deposition, which was obtained under oath and is still under seal. Wild worked at IBM for almost eight years and left his role last October, according to his LinkedIn page. Wild said he couldn't comment on the issue.

IBM began working to "correct [its] seniority mix" in 2014, according to the class-action lawsuit filed in New York. The company started firing older workers and replacing them with millennials, who IBM's consulting department said "are generally much more innovative and receptive to technology than baby boomers."

Last month, Armonk, New York-based IBM cut about 2,000 employees. "We are continuing to reposition our team to align with our focus on the high value segments of the IT market - while aggressively hiring in critical new areas that deliver value for our clients and IBM," the company said in a statement at the time.

Last March, ProPublica published an extensive investigation that found IBM had fired an estimated 20,000 U.S. employees ages 40 or older in the past five years.

Read more about IBM managers discussing ways to thin older ranks

In 2015, an IBM spokesman denied a Forbes report that the company would be laying off 100,000 employees - or a quarter of its workforce -- in the coming years, dismissing the claims in an interview with USA Today as "ridiculous" and "baseless."

*(Updates with details in the ninth paragraph)*

## In this article

IBM
**IBM**
**124.16** USD  ▲ +0.01 +0.01%

GOOGL
**ALPHABET INC-A**
**1,434.12** USD  ▼ -18.42 -1.27%

AMZN
**AMAZON.COM INC**
**2,653.98** USD  ▲ +13.00 +0.49%

Terms of Service Do Not Sell My Info (California)Trademarks Privacy Policy
©2020 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Contact Us Help

**AGE DISCRIMINATION**

# IBM Accused of Violating Federal Anti-Age Discrimination Law

A group of ex-employees filed a lawsuit that accuses the tech giant of failing to comply with a law requiring companies to disclose the ages of people over 40 who have been laid off. The suit also alleges that the company has improperly prevented workers from combining to challenge their ousters.

by Peter Gosselin, March 27, 2019, 9:53 a.m. EDT



*The IBM logo on the entrance to the Highlight Towers in Munich, Germany. (Matthias Balk/picture alliance via Getty Images)*

*ProPublica is a nonprofit newsroom based in New York. Sign up for ProPublica's Big Story newsletter to receive stories like this one in your inbox as soon as they are published.*

A group of former employees has filed a lawsuit against IBM that accuses the tech giant of failing to comply with a federal law that requires companies to disclose the ages of people they lay off who are 40 or older. The suit, filed in federal district court in New York City, also alleges that the company has improperly prevented workers from combining to challenge their ousters.

It is the second broad legal action against IBM since a 2018 ProPublica story that documented widespread age discrimination by the company in

its global restructuring. The former employees are asking the court to invalidate a written agreement that IBM requires its employees to sign to receive severance pay. Under the document's provisions, workers agree to give up any right to challenge their dismissal in court.

Until now, most age-related legal actions contesting an IBM layoff have been brought by the rare ex-worker who refused to sign the agreement and left without severance. If the district court were to agree that IBM's separation agreement is invalid, it could open the company up to lawsuits by tens of thousands of older workers IBM has laid off in recent years.

Today's lawsuit and the string of other cases filed in the wake of ProPublica's story face steep odds as a result of decisions by the Supreme Court and federal appeals courts that curtailed workers' ability to challenge employers' staffing decisions. The rationale is to limit what federal judges view as cumbersome, costly cases that hamstring both employers and the courts.

"The Supreme Court is hostile to class action, to collective action and to employees," said Cliff Palefsky, a prominent San Francisco attorney who frequently represents employees. "Congress needs to step in to preserve the integrity of its own civil right laws, not just involving age, but also race and gender. So far, it hasn't."

ProPublica reported in March 2018 that IBM, which had annual revenue of $79 billion last year, had ousted an estimated 20,000 U.S. workers ages 40 and over during the preceding five years. In some instances, it used money saved from the departures to hire young replacements to, in the words of one internal company document, "correct seniority mix."

The new lawsuit follows legal action last fall by Boston class-action lawyer Shannon Liss-Riordan, who filed a class-action case on behalf of 60 ex-IBM employees who had not signed the severance agreement and argued they had been discriminated against because of their age. In tandem, Liss-Riordan filed scores of arbitration claims for ex-employees who had signed the document, which only permits workers to pursue age claims in individual arbitration hearings.

The New York lawsuit opens a new legal front, challenging the IBM agreement's one-at-a-time restriction as a violation of workers' rights under the federal Age Discrimination in Employment Act. The law allows laid-off workers to take legal action against their employers as a group, either in court or arbitration.

"IBM against one person is not a fair fight," said David Webbert, an Augusta, Maine, lawyer who, together with his partner, Jeffrey Young, and a Washington-based law firm, filed the new case. "IBM against thousands of people who've been laid off because of their age, that's a legitimate legal proceeding.

"IBM is afraid of a fair fight," Webbert said.

A spokesman said the company had no comment on the latest lawsuit. In response to ProPublica's initial findings in 2018, IBM said: "We are proud of our company and our employees' ability to reinvent themselves era after era, while always complying with the law. Our ability to do this is why we are the only tech company that has not only survived but thrived for more than 100 years."

The new suit is filed in the name of four ex-employees who were in their mid-50s when they were ousted by the company, including Cheryl Witmer of Firestone, Colorado.

Witmer said in an interview she began her career repairing IBM Selectric typewriters in 1984 and was a program manager in the company's cloud division in 2016 when she unexpectedly received a bad job-performance rating and was told she was retiring.

"But I'm not retiring," she said she told her manager.

"Yes, you are," she quoted the manager as replying. ProPublica documented dozens of similar employee ousters that began as layoffs but were converted to retirements, a change that kept down IBM's layoff counts, where high numbers can trigger public disclosure requirements.

Witmer said she felt she had little choice but to sign the company's severance agreement because she needed the money while she looked for a new job. "I couldn't afford not to" sign, she said.

The ADEA requires that workers over 40 who are being laid off be told the job positions and the ages of the position holders who are being laid off with them so they can decide whether to pursue an age-discrimination case or to waive the right to do so.

IBM stopped providing this information to employees in 2014 when it rewrote its severance agreement. Under the previous agreement, departing employees could not receive severance unless they agreed to waive their right to pursue legal action. The new agreement employees were required to sign to receive severance did allow them to file claims of discrimination, but only in individual hearings before an arbitrator.

IBM executives appear to have concluded that this change in the document permitted them to stop providing the ages of employees were being laid off. Legal experts say this made it much harder to find evidence of age discrimination, which requires establishing a pattern drawn from large numbers of layoffs.

Until the newly filed suit, IBM's decision to stop disclosing age information has not faced legal challenge.

6/19/2020                IBM Age Discrimination Litigation: Estle, et al. v. International Business Machines Corporation | Cohen Milstein

# COHENMILSTEIN

PRACTICE AREA:   CIVIL RIGHTS & EMPLOYMENT

# IBM Age Discrimination Litigation: Estle, et al. v. International Business Machines Corporation

*If you were terminated by IBM as a part of a group termination when you were age 40 or older and you would like to join this action as a party claimant, please review, complete, and submit the IBM Age Discrimination Questionnaire accessible here.*

On March 27, 2019, Cohen Milstein and Johnson, Webbert & Young, LLP, on behalf of former employees of IBM Corporation, filed an age discrimination class action against the tech giant in U.S. District Court for the Southern District of New York (White Plains) for violating the federal laws prohibiting age discrimination, including the Older Workers Benefit Protection Act (OWBPA) and the Age Discrimination in Employment Act (ADEA).

The plaintiffs bringing the class action are all over age 55 and were terminated by IBM in 2016 in one of its "Resource Actions."  They are just four of over 20,000 IBM employees over the age of 40 who have been discharged from IBM during the past six years.

## Case Background

Plaintiffs allege that in 2014 IBM began implementing a company-wide plan, hatched by top executives, to illegally conceal evidence of its large-scale discriminatory layoffs—called "Resource Actions"—that eliminated older employees in favor of much younger ones.

Also in 2014, plaintiffs allege, IBM made an intentional decision to begin concealing information about the layoff demographics as required by the OWBPA. Contrary to its past practices, IBM began asking laid-off workers to release their right, under the ADEA, to bring age discrimination claims collectively as a group without providing any of the "minimum" evidence explicitly required by the OWBPA. Plaintiffs further allege that IBM also coerced laid-off workers to sign arbitration agreements, waiving their federally-protected rights to bring ADEA claims in court.

The OWBPA protects older workers from unfair coercion and manipulation when they are laid off and offered severance packages in return for the release of their rights to bring age discrimination claims under the ADEA. One key protection is that the employer cannot obtain a valid release from a group of laid-off workers of their rights under the ADEA without first providing them with critical comparator evidence of possible age discrimination in the layoff selection process.

The OWBPA mandates without exception disclosures including "any eligibility factors" for the layoff, as well as the ages and job titles of everyone in their unit who lost their job and everyone in their unit who was spared. Congress determined this "minimum" information was essential for employees to knowingly evaluate whether the layoff "may be designed to remove older workers from the labor force."

Plaintiffs allege that IBM took the calculated risk of openly breaking the law to cover up its massive layoffs of older workers, which were designed to "correct" its "seniority mix" by replacing baby boomers with what it called "early professional hires." This effort was the culmination of its internal reviews that stereotyped older workers as rigid and unreceptive to technology, and branded millennial employees as innovative.

Plaintiffs cite numerous examples of this corporate plan to remove older employees to make way for millennials, including 1) IBM's HR Dep't devised rules making older workers more likely to be selected for Resource Actions. For example, IBM exempted its so-called "early professional hires" and recent college graduates from Resource Actions, and 2) IBM also manipulated the performance review process by directing the reduction of the annual performance ratings for older workers and then using those sham evaluation scores as a key factor to justify picking older workers to be discharged through the Resource Actions.

The lawsuit comes after a bombshell story last summer by ProPublica, "Cutting 'Old Heads' at IBM," which exposed a company-wide pattern of age discrimination practices spanning many units and geographical locations.

While filing their complaint in federal court, asking the court to invalidate their release of their ADEA rights, Plaintiffs are also filing age discrimination claims in arbitration because IBM's Severance Agreement requires them to take all their claims to arbitration.

In addition to seeking to invalidate the illegal waiver of their rights under the ADEA, Plaintiffs seek the issuance of notice to all other similarly situated laid off older employees who were coerced into signing the invalid releases and the certification of their collective claims under the ADEA, as well as declaratory, equitable, and monetary relief.

**If you were terminated by IBM as a part of a group termination when you were age 40 or older and you would like to join this action as a party claimant, please review, complete, and submit the IBM Age Discrimination Questionnaire accessible here.**

**Mail, fax, or email the completed consent form to:**

**Johnson, Webbert & Young LLP**

**P.O. Box 79**

**Augusta, ME 04332**

**Fax: 207.622.4160**

**npollock@work.law**

## CASE DOCUMENTS

S.D.N.Y. Complaint - March 27, 2019

JAMS Complaint - March 27, 2019

IBM Age Discrimination Questionnaire

## RELATED PROFESSIONALS

Shaylyn Cochran

Joseph M. Sellers

## RELATED NEWS & EVENTS

- IBM Sued for Massive Scheme to Cover Up Discriminatory Layoff of Over 20,000 Older Workers in Knowing Violation of Disclosure Requirements

- "Another Group of Older Ex-Employees Are Suing IBM Alleging It Targeted Older Workers for Layoffs," Business Insider

- "Former IBM Employees Sue Company in Federal Age-Discrimination Lawsuit," New York Law Journal

- "Former IBM Employees Sue Over Alleged Age Discrimination," PressFrom

- "IBM Accused of Violating Federal Anti-Age Discrimination Law," ProPublica

- "IBM Faces New Age Discrimination Lawsuit for Targeting 'Gray Hairs,'" Dice Insights

- "IBM Schemed to Hide Age Bias in Layoffs, Ex-Workers Say," Law360

- "IBM Sued for Age Discrimination," Longmont Times-Call

© 2020 Cohen Milstein Sellers & Toll PLLC. All rights reserved.

ATTORNEY ADVERTISING. Prior results do not guarantee a similar outcome.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDVIN RUSIS, HENRY GERRITS,<br>and PHIL MCGONEGAL,<br>individually and on behalf of all other<br>similarly situated individuals,<br><br>    Plaintiffs,<br><br>    v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORP.<br><br>    Defendant. | Civil Action No. _____<br><br>**JURY DEMANDED** |

### CLASS AND COLLECTIVE ACTION COMPLAINT

1.     This is a class and collective action brought by Edvin Rusis, Henry Gerrits, and Phil McGonegal on behalf of themselves and all other similarly situated employees who have worked for Defendant International Business Machines Corporation (hereinafter "IBM"), alleging that IBM, through its layoff and hiring practices, violated (1) the Age Discrimination in Employment Act, as amended ("ADEA"), 29 U.S.C. § 621 *et seq.*; (2) the California Fair Employment and Housing Act, Cal. Gov. Code § 12941 (with respect to California employees); and (3) the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. Ann. §§ 143-422.1 to 143-422.3 (with respect to North Carolina employees).  As described further below, IBM has discriminated, and continues to discriminate, against its older workers, both by laying them off disproportionately to younger workers and by not hiring them for open positions. Over the last several years, IBM has been in the process of systematically laying off older

employees in order to build a younger workforce. Between 2012 and the present, IBM has laid off at least 20,000 employees over the age of forty. Such discriminatory layoff and hiring practices constitute unlawful discrimination under the ADEA and state anti-discrimination law.

2.      Plaintiffs bring these claims on behalf of themselves and similarly situated IBM employees across the country who may choose to opt in to this action pursuant to 29 U.S.C. §§ 216(b), 626(b).

3.      Plaintiffs also bring these claims under the laws of the states in which they have worked pursuant to Fed. R. Civ. P. 23.

## II.    PARTIES

4.      Plaintiff Edvin Rusis is fifty-nine (59) years old and resides in Laguna Niguel, California. Mr. Rusis worked for IBM for approximately fifteen (15) years before his layoff, effective June 27, 2018.

5.      Plaintiff Henry Gerrits is sixty-seven (67) years old and resides in Cary, North Carolina. Mr. Gerrits worked for IBM for approximately thirty-three (33) years, before his layoff, effective on June 27, 2018.

6.      Plaintiff Phil McGonegal is fifty-five (55) years old and resides in Atlanta, Georgia. Mr. McGonegal worked for IBM for approximately thirty-four (34) years before his layoff, effective approximately June 30, 2018.

7.      Plaintiffs bring these claims on behalf of themselves and similarly situated IBM employees across the country who may choose to opt in to this action pursuant to 29 U.S.C. §§ 216(b), 626(b).

8.      Plaintiff Rusis also brings this case as a class action on behalf of himself

and all similarly situated individuals who worked for IBM in California, pursuant to Fed.

R. Civ. P. 23.

9.      Plaintiff Gerrits also brings this case as a class action on behalf of himself

and all similarly situated individuals who worked for IBM in North Carolina, pursuant to

Fed. R. Civ. P. 23.

10.     Defendant International Business Machines Corp. is a New York

corporation with its principal place of business in Armonk, New York. IBM is an

American multinational technology business that offers services and goods ranging from

computing, cloud platforms, advanced analytics tools and others.

## III.   <u>JURISDICTION AND VENUE</u>

11.     This Court has general federal question jurisdiction over this matter

pursuant to 28 U.S.C. § 1331, because Plaintiffs have brought a claim pursuant to the

federal Age Discrimination Employment Act, 29 U.S.C. § 621 *et seq*. This Court has

supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C.

§1367.

12.     The Southern District of New York is the proper venue for this action

pursuant to 28 U.S.C. § 1391(b)(1) because IBM's principal place of business is in

Armonk, New York.

## IV.   <u>STATEMENT OF FACTS</u>

13.     Plaintiffs were among thousands of IBM employees to be laid off recently,

as the result of a shift in IBM's personnel focus to the generation of workers referred to

as "Millennials" (which IBM defines as the generation born after 1980) that began in

approximately 2012. At that time, IBM began a program to reform itself into a leading company in the fields of cloud services, big data analytics, mobile, security and social media. As a part of this transformation, IBM endeavored to begin heavily recruiting Millennials in order to make the face of IBM younger, while at the same time pushing out older employees. In an article published by ProPublica following an investigation of IBM's hiring practices, ProPublica reported that it estimates that "in the past five years alone, IBM has eliminated more than 20,000 American employees ages 40 and over, about 60 percent of its estimated total U.S. job cuts during those years." Peter Gosselin and Ariana Tobin, *Cutting 'Old Heads' at IBM*, ProPublica (March 22, 2018), https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/

14.     As reported by ProPublica, IBM's shift in focus toward the Millennial workforce came as "IBM was falling behind . . . by failing to quickly devise innovative uses for the internet like its new rivals, Google, Facebook, and Amazon." Id. In response to that problem, IBM's CEO Virginia Rommetty "launched a major overhaul that aimed to make IBM a major player in the emerging technologies of cloud services, big data analytics, mobile security and social media, or what came to be known inside as CAMS" and "sought to sharply increase hiring of people born after 1980." Id. Additionally, IBM embraced the belief that "CAMS are driven by Millennial traits." Id.

15.     Moreover, in 2006 one of IBM's consulting arms issued a paper that referred to workers in the "Baby Boomer" generation as "gray hairs" and "old heads," stated that "successor generations . . . are generally much more innovative and receptive to technology than baby boomers," and advised that "What businesses can't afford to do is simply rehire their experienced workers and put them back into their old

4

jobs." <u>See</u>, The Maturing Workforce: Innovation in Workforce Enablement, IBM

Business Consulting Services, https://www-935.ibm.com/services/uk/bcs/pdf/maturing-

workforce-feus01291-1.pdf (2006).

16.     As another expression of IBM's shift in focus to embrace Millennials, at a

2014 IBM conference called "Reinvention in the Age of the Millennial," IBM announced

its intent to "embrace the 'Millennial mindset'" and announced that "What's good for

Millennials is good for everyone." <u>See</u> Reinvention in the Age of the Millennial,

https://ibmcai.com/2014/12/16/reinvention-in-the-age-of-the-millennial/ (Dec. 16, 2014).

17.     IBM pared down the population of its older workers largely through what

IBM refers to as "Resource Actions," reductions in force or layoffs, in other words. IBM

shields its youngest employees from layoff, exempting recent college graduates from

reduction for nine months from their hire date.

18.     Prior to 2014, IBM provided lists to any workers who were laid off, which

disclosed the positions and ages of all the employees laid off from their business units

at the same time, as well as a list showing the positions and ages of all those in the

business units that were not being laid off.  IBM distributed this information, presumably,

in order to comply with the Section 626(f) of the ADEA, which requires disclosure of this

information if an employer seeks to obtain a release of age discrimination claims from a

group of employees. However, in 2014, in an apparent effort to conceal its systematic

effort to shed its older workers, IBM stopped disclosing this information to the

employees. While IBM could no longer include a release of ADEA claims in its

severance agreements with its employees as a result, it opted instead to require its

employees to agree to binding individual arbitration of those claims, in order to receive a

small severance payment.  Many IBM employees who were laid off, including the named plaintiffs in this action, rejected the severance offer and did not sign the arbitration agreement.

19.     Plaintiff Rusis began working at IBM in 2003 as a strategic services specialist and later became a solution manager for IBM's global system integrator alliances. In March 2018, Plaintiff Rusis received a letter from IBM stating that he was being laid off, effective on June 27, 2018. After being notified that he would be laid off, Plaintiff Rusis used IBM's internal hiring platform to apply for five positions for which he was qualified, including one position on his former Global System Integrator Sales team. Plaintiff Rusis did not receive a response regarding any of these job applications.

20.     Plaintiff Gerrits began working for IBM, in August 1985, and most recently held the position of global commodity manager. On March 29, 2018, Plaintiff Gerrits received a letter from his manager informing him that he was being laid off by IBM effective June 27, 2018.  Plaintiff Gerrits was one of the oldest employees in his group. Although Plaintiff Gerrits applied to several positions through IBM's internal hiring platform for which he was qualified, he did not receive any response to his applications.

21.     Plaintiff McGonegal began working for IBM in 1986 in Atlanta, Georgia. Most recently, Plaintiff McGonegal worked for IBM as a second line manager of its asset management organization. Plaintiff McGonegal was let go by IBM on June 30, 2018.

22.     Upon information and belief, IBM has flagged the individuals who have been laid off through its Resource Actions as ineligible for consideration for other positions through IBM's internal hiring platform.  It has used this type of technique to

prevent its older workers who have been laid off from obtaining new positions within the company.

## V.   COLLECTIVE ACTION ALLEGATIONS

23.    Plaintiffs bring this case as a collective action on behalf of IBM employees who have worked anywhere in the country who may opt in to this action.

24.    These employees who may opt in to this collective action are similarly situated to the named Plaintiffs. They have all worked for IBM under substantially similar conditions and have all been subjected to IBM's policy and practices of targeting for layoff, and disproportionately laying off employees over forty (40) years old, and then precluding those employees from consideration for other open internal IBM positions for which they are qualified.

## VI.   CLASS ACTION ALLEGATIONS

25.    Plaintiffs also bring this case as a class action on behalf of IBM employees over the age of forty (40) and were laid off, who have worked for IBM in California or North Carolina.

26.    These California and North Carolina classes all meet the prerequisites of Fed. R. Civ. P. 23 in that:

   a. The classes are so numerous that joining all members is impracticable. The exact number of the members of each class is unknown, but it is estimated that there have been well more than forty (40) IBM employees over the age of forty (40) who have been laid off in each of these states. As a result, joinder of all of these individuals is impracticable.

7

    f.   Litigating these claims as a class action is superior to other available

methods for the fair and efficient adjudication of these claims. Among

other things, individual adjudications would result in a highly inefficient

duplication of discovery for many IBM employees in these states, briefing

of legal issues, and court proceedings.

## VII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

27.    Plaintiffs timely filed Class Charges of Discrimination with the EEOC. More

than sixty (60) days have passed since they submitted those Charges of Discrimination.


### COUNT I

(Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*)
(On Behalf of Plaintiffs and Class)


28.    Plaintiffs re-allege and incorporate the above paragraphs by reference as

if fully set forth herein.

29.    IBM's conduct in systematically targeting for layoff employees who are

older than forty (40), including Plaintiffs, and refusing to consider those employees for

other open IBM positions for which they are qualified, constitutes age discrimination in

violation of the ADEA. IBM's violation of the ADEA has been knowing and willful. As a

direct and proximate cause of IBM's discrimination, Plaintiffs and similarly situated

employees have lost their jobs and have been denied the fair opportunity to obtain new

positions with IBM.

30.    This claim is brought on behalf of a class of IBM employees across the

country who may choose to opt in to this case, pursuant 29 U.S.C. §§ 216(b), 626(b).

## COUNT II

(California Fair Employment and Housing Act, Cal. Gov't Code § 12900, *et seq.*)
(On Behalf of Plaintiff Rusis and Class)

31.    Plaintiffs re-allege and incorporate the above paragraphs by reference as if fully set forth herein.

32.    Plaintiff Rusis brings this claim as a class action, pursuant to Fed. R. Civ. P. 23, on behalf of IBM employees who have worked in California and have been subjected to the discriminatory practices described herein.  IBM's conduct in systematically targeting for layoff employees who are older than forty (40), including Plaintiff Rusis, and refusing to consider those employees for other open IBM positions for which they are qualified, constitutes age discrimination in violation of the California Fair Employment and Housing Act, Cal. Gov't Code § 12900, *et seq.* IBM's violation of California law has been knowing and willful. As a direct and proximate cause of IBM's discrimination, Plaintiff Rusis and similarly situated employees who have worked in California have lost their jobs and have been denied the fair opportunity to obtain new positions with IBM.

## COUNT III

(North Carolina Employment Practices Act,
N.C. Gen. Stat. Ann. §§ 143-422.1 to 143-422.3)
(On Behalf of Plaintiff Gerrits and Class)

33.     Plaintiffs re-allege and incorporate the above paragraphs by reference as if fully set forth herein.

34.     Plaintiff Gerrits brings this claim as a class action, pursuant to Fed. R. Civ. P. 23, on behalf of IBM employees who have worked in North Carolina and have been subjected to the discriminatory practices described herein. IBM's conduct in systematically targeting for layoff its employees who are older than forty (40), including Plaintiff Gerrits, and refusing to consider those employees for other open IBM positions for which they are qualified, constitutes age discrimination in violation of the North Carolina Employment Practices Act, N.C. Gen. Stat. Ann. §§ 143-422.1 to 143-422.3. IBM's violation of North Carolina law has been knowing and willful. As a direct and proximate cause of IBM's discrimination, Plaintiff Gerrits and similarly situated employees have lost their jobs and have been denied the fair opportunity to obtain new positions with IBM.

## JURY DEMAND

Plaintiffs request a trial by jury on all claims.

11

WHEREFORE, Plaintiffs request that this Court enter the following relief:

1.      Permission for Plaintiffs to notify other IBM employees of their right to opt-in to this action under the ADEA, pursuant to 29 U.S.C. §§ 216(b), 626(b);

2.      Find and declare that IBM violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*;

3.      Certify a class action pursuant to Fed. R. Civ. P. 23 under Count II and appoint Plaintiff Rusis and his counsel to represent a class of IBM employees who were over the age of forty (40), worked for IBM in California, and were laid off;

4.      Certify a class action pursuant to Fed. R. Civ. P. 23 under Count III and appoint Plaintiff Gerrits and his counsel to represent a class of IBM employees who were over the age of forty (40), worked for IBM in North Carolina, and were laid off;

5.      Award compensatory damages, including back pay and front pay, in an amount according to proof;

6.      Reinstate Plaintiffs and similarly situated employees to their positions;

7.      Award all costs and attorney's fees incurred prosecuting this claim;

8.      Award liquidated damages and all appropriate statutory and regulatory damages;

9.      Award interest;

10.     Issue injunctive relief in the form of an order directing IBM to comply with the ADEA and applicable state law.

11.     Any other relief to which Plaintiffs and class members may be entitled.

Dated: September 17, 2018

Respectfully submitted,

EDVIN RUSIS, HENRY GERRITS, and
PHIL MCGONEGAL, on behalf of themselves
and all others similarly situated,

By their attorneys,


/s/ Shannon Liss-Riordan
Shannon Liss-Riordan,
*pro hac vice forthcoming*
Thomas Fowler,
*pro hac vice* forthcomimg
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com, tfowler@llrlaw.com

March 16, 2020

# New York Federal Court Finds That A Common Policy Or Plan Is Still Critical To ADEA Collective Actions

Gerald Maatman, Jr., Alex Oxyer, Jennifer Riley, Paul Waldera

Seyfarth Shaw LLP

 + Follow   Contact

***Seyfarth Synopsis:*** *In Rusis, et al. v. Int'l Bus. Machines Corp., No. 18 Civ. 8434, 2020 WL 1151322, at \*2 (S.D.N.Y. Mar. 10, 2020), the U.S. District Court for the Southern District of New York recently declined to conditionally certify a nationwide collective action brought against IBM on behalf of all employees over the age of 40, and in the process cast doubt of the availability of nationwide collective actions as a whole in this context. The Court ultimately found that the plaintiffs had failed to demonstrate the existence of any glue that bound the putative collective class together.  The ruling is an important guidepost for employers facing these types of lawsuit.*

## Case Background

In *Rusis*, four former employees filed a collective action alleging violations of the Age Discrimination in Employment Act ("ADEA"). Plaintiffs asserted that IBM implemented a "company-wide effort to replace older employees with younger hires" that discriminated against all IBM employees over 40 and forced them to depart because of their age. *Id.* at \*3. According to the plaintiffs, IBM used several methods to reduce its older worker population, including terminating older employees for pretextual reasons, constructively discharging employees over 40, or imposing unreasonable conditions on their continued employment, all the while shielding younger employees in the company from similar conditions.  The plaintiffs also pointed to efforts by the company to compete in emerging technology spa                                                          or employees to "embrace the Millennial mindset" as furth Critically, the named plaintiffs all worked in different p                                                          r different states, including California, North Carolina, G

This website uses cookies to improve user experience, track anonymous site usage, store authorization tokens and permit sharing on social media networks. By continuing to browse this website you accept the use of cookies. Click here to read more about how we use cookies.

Continue

## The Court's Decision

In its opinion, the Court considered the plaintiffs' moti                                                     of the putative collective action. At the notice stage in a pr needs to make a "make a modest factual showing that t                                                     s together were victims of a common policy or plan that violated the law." *Id.* The Court held that

while the burden at this stage is modest, "it is not non-existent" and "generally cannot be satisfied by unsupported assertions." *Id.*. In an ADEA case, when the court has a more developed record "the named plaintiffs must prove that the plaintiffs who have opted in are, in fact, similarly situated to the named plaintiffs and were all subject to the same illegal employment practice such that their cases can all be tried together." *Id.*

The Court opined that the Plaintiffs failed to meet their burden of tying all former employees over the age of 40 to a common policy or plan.  The District Court evaluated the plaintiffs' proposed collective action in terms of "whether the plaintiffs are employed in the same corporate department, division and location; whether they advanced similar claims of age discrimination; [and whether they] had similar salaries and circumstances of employment."  *Id.* The Court concluded that that plaintiffs' motion failed under all of these factors.

In support of their motion, the plaintiffs submitted 15 affidavits from former employees.  Each affidavit described a particular incident of alleged age discrimination at different locations, divisions, seniority levels, and job functions.  The Court rejected this proof. It determined that each alleged case of age discrimination had a different decision-maker.

The Court ruled that the various allegations between the different affidavits, on their face, did not preclude Plaintiffs' from proceeding as a collective action.  Rather, the affidavits, taken as a whole, did not meet the minimal showing that a common plan or policy existed to replace older workers with younger workers.  Read together, the Court found that the affidavits contained very little evidence connecting one act of alleged discrimination to another. The Court also discounted a blanket, copy-and-paste assertion from affiants that "[b]ased on [their] conversations with other current and former IBM employees, [they] expect that there are many other employees over the age of forty (40) who have lost or will shortly lose their jobs at IBM, who would be interested in joining the case if notified of their right to do so."  *Id.* at *3-4. The Court held that "vague allusions to conversations with co-workers do not support conditional certification." *Id.* at *4.

The Court also rejected other tangential evidence provided by the plaintiffs.  To support their motion, the plaintiffs submitted an article by *ProPublic* article that reported that IBM believed emerging techn and that IBM "sought to sharply increase hiring of peop declined to rely on the article because it was not based rather based on "subjective synthesis of various statisti statements by individuals whose journalistic credential Court also rejected an internal IBM document from 20 "old heads," as well as a presentation document entitle Millennial." *Id.* The Court found that none of these do actual plan to replace older workers with younger ones.

This website uses cookies to improve user experience, track anonymous site usage, store authorization tokens and permit sharing on social media networks. By continuing to browse this website you accept the use of cookies. Click here to read more about how we use cookies.

Continue

Ultimately, the Court denied the plaintiffs' motion to issue notice to the members of the putative collective action on a nationwide basis because they failed to show that the putative collective action members were alike in "ways that matter to the disposition of their claims." *Id.* at *6.

### Implications for Employers

*Rusis* provides strong support for any employer seeking to defeat certification for a nationwide ADEA collective action. While the Court did not shut the door on ever certifying a nationwide collective action, it is incumbent on plaintiffs to show more evidence and support to prosecute a nationwide common policy or practice than just a few company documents and conclusory testimony.

[ ✉ Send ]   [ 🖶 Print ]   [ ⚠ Report ]

## LATEST POSTS

- **US Department of Treasury Proposes Regulations Under Code Section 1031 That Provide Taxpayer-Friendly Guidance on Like-Kind Exchanges**

- **Class Action Survival Guide – The Top Five Things That Employers Need To Do In Defending Post-COVID-19 Litigation**

- **HHS Issues Final Rule on Section 1557**

- **Litigation Developments Regarding Child Victim Act Cases**

- **Seyfarth Policy Matters Newsletter - June 2020**

See more »

DISCLAIMER: Because of the generality of this update, the information p
and should not be acted upon without specific legal advice based on par

© Seyfarth Shaw LLP 2020 | Attorney Advertising

This website uses cookies to improve user experience, track anonymous site usage, store authorization tokens and permit sharing on social media networks. By continuing to browse this website you accept the use of cookies. Click here to read more about how we use cookies.

[ Continue ]

**WRITTEN BY:**



Seyfarth Shaw LLP

Contact   [ + Follow ]

 Gerald Maatman, Jr.

[ + Follow ]

# USA: IBM faces several lawsuits over alleged age discrimination after firing employees

## Author: Olivia Carville, Bloomberg (USA), Published on: 9 August 2019

"IBM Fired as Many as 100,000 in Recent Years, Lawsuit Shows", 31 Jul 2019

International Business Machines Corp. has fired as many as 100,000 employees in the last few years in an effort to boost its appeal to millennials and make it appear to be as "cool" and "trendy" as Amazon and Google, according to a deposition from a former vice president in an ongoing age discrimination lawsuit.

The technology company is facing several lawsuits accusing it of firing older workers, including a class-action case in Manhattan and individual civil suits filed in California, Pennsylvania and Texas last year.

"We have reinvented IBM in the past five years to target higher value opportunities for our clients," IBM said in a statement. "The company hires 50,000 employees each year."

In his deposition, Wild said 108-year-old IBM faced talent recruitment problems and determined one way to show millennials that IBM was not "an old fuddy duddy organization" was to make itself appear "as [a] cool, trendy organization" like Alphabet Inc.'s Google and Amazon.com Inc., according to the document. To do that, IBM set out to slough off large portions of its older workforce using rolling layoffs over the course of several years, according to court documents...

This strategy deliberately targeted older workers like the plaintiff, Texas-based Jonathan Langley, 61, who has accused IBM of firing him after more than 24 years because of his age, according to the document. IBM filed a motion to dismiss the Langley case on Tuesday, the lawyers filed information in opposition to that motion...

Accept

𝕷𝖔𝖘 𝕬𝖓𝖌𝖊𝖑𝖊𝖘 𝕿𝖎𝖒𝖊𝖘

LOG IN 🔍

ADVERTISEMENT

BUSINESS

# Column: Ginni Rometty's lousy record — but excellent pay — at IBM



IBM Chief Executive Ginni Rometty attends the annual Allen & Co. Sun Valley Conference in July. (Drew Angerer / Getty Images)

By MICHAEL HILTZIK | BUSINESS COLUMNIST

JAN. 31, 2020 | 11:54 AM

↪

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

**Get Unlimited Digital**
**$1** for **4 weeks** | **$98** for **1 year**       SUBSCRIBE

✖

Rometty, whose retirement from that post after eight years at IBM's helm was announced Thursday, presided over a decline in the company's share price of roughly 26%. That's unadjusted for dividends.

Throw those in, and the best one could say as an investor is that IBM has been dead money: The shares closed on Jan. 1, 2012, the day she took over, at $138.54 and closed on Thursday at $136.77.

On Friday, when the broad market gave up 1.77% largely on coronavirus fears, IBM gained more than 5%, closing at $143.70. It's reasonable to take the gain as a signal that investors are hoping for better results under new management.

ADVERTISING



Ads by Teads

Rometty's reign included one stretch of 22 straight quarters of declining revenue. That run finally ended in the fourth quarter of 2017, but the company's annual results continued to be dismal. Year-to-year revenue growth was negative in 2015, 2016 and 2017 but eked out a 1% gain in 2018.

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close ✕

**Get Unlimited Digital**
**$1** for **4 weeks** | **$98** for **1 year**

SUBSCRIBE

Case 1:20-cv-05430-JGK   Document 1   Filed 07/16/20   Page 72 of 74

ADVERTISEMENT

To be fair, it's not unusual for a company in the technology sector to fall by the wayside, even after decades of domination. The same fate has befallen Xerox, Hewlett-Packard and General Electric, after all.

Rometty worked hard to shore up IBM's position in the evolving field, but success seemed perennially to lurk just over the horizon. As it happens, her most eye-catching move in this vein was the $34-billion acquisition of Red Hat, a leading firm in what's known as hybrid cloud environments, which closed last summer. Krishna is reported to have been the main architect of that deal, and Red Hat's CEO, James Whitehurst, will take over Rometty's title of IBM president.

Meanwhile, however, Rometty became an exemplar of the dysfunction in executive compensation in U.S. industry. Rometty was probably not the most overpaid chief executive in America, but given IBM's size and stature, it's not unfair to take a closer look at her compensation.

In 2015, for a start, IBM announced (quietly) that it had granted Rometty a $3.6-million bonus for 2014 and a $13.3-million stock incentive award payable in 2018. She also received a 6.7% bump in her base salary, to $1.6 million from $1.5 million.

ADVERTISEMENT

That was based on a record for 2014 that included a nearly 6% decline in revenue and a plunge in net income of 27%. IBM shares began 2014 at a dividend-adjusted $183.12 and ended the year at $160.44, a drop of 12.4%. During that period, the Standard & Poor's 500 index *rose* 12.4%. IBM had been the worst-performing stock on the Dow Jones industrial average for two years in a row.

The board tried to suggest that Rometty was being docked for what it called "the shortfall in financial results relative to expectations" — her compensation came to only 74% of the targeted maximum, after all -- but it said it balanced the shortfall "against the substantial strategic actions taken to reposition the company, including the expansion into new markets with competitive offerings and execution of significant restructuring and divestitures." In other words, little harm, little foul.

BUSINESS

**Why you should care that IBM's CEO is grossly overpaid**

Feb. 6, 2015

The following year, Rometty notch[...]                                                            and the

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy.  Close

**Get Unlimited Digital**

**$1** for **4 weeks** | **$98** for **1 year**

SUBSCRIBE

ADVERTISEMENT

In 2016, Rometty had a pretty good year, with the share price gaining 20.6%, its best performance since the year before she took over. The board gave her a bonus of $4.95 million, her biggest ever until the following year, when it rose to $5.1 million (though the stock had fallen by nearly 7.6%).

As I mentioned in 2016, there has never been any mystery why Rometty's pay, like that of other CEOs of major corporations, remains buoyant in good times and bad: It's cultural. In 2019, eight of the 11 board members (not counting Rometty herself) were themselves current or former CEOs of major corporations, as were three of the four members of the board's compensation committee.

**BUSINESS**
**HP and Xerox: Can two dinosaurs carry each other into the high-tech future?**
Nov. 15, 2019

In other words, they were distinguished representatives of America's CEO culture, which turns a blind eye to performance that warrants a pay cut, not to mention a firing. When performance stalls or declines, they often find a silver lining, citing "progress" toward a distant goal.

ADVERTISEMENT

In 2015, for instance, IBM's then-chief financial officer, Martin Schroeter, said during an investor conference call that the company's "strategic" transition toward "big data and analytics, around cloud, and around mobile and security" was still underway. It was just that signs of its progress "toward these strategic imperatives, and in the investments we've been making ... aren't yet reflected in our revenue streams," he said.

It's possible that Rometty's efforts to move IBM into the 21st century technological world will finally bear fruit; management is optimistic about the Red Hat deal, as was made clear by Whitehurst's elevation (and the rich price of the acquisition). If that happens, Rometty will be well-placed to take credit for finally turning IBM around. But she already has been paid for the achievement, in spades. If it fails, the IBM board can mark it down as just another failed investment, and count Rometty's pay as part of the cost.

BUSINESS

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

Get Unlimited Digital
$1 for 4 weeks | $98 for 1 year

SUBSCRIBE

✖



FedEx Express

THU - 02 JUL 4:30P
EXPRESS SAVER

10007
NY-US EWR

SA PCTA

TRK# 3943 1330 0502
0201

Align bottom of peel-and-stick airbill or pouch here.

BILL SENDER

UNITED STATES US

To

US COURT HOUSE (SDNY)
500 PEARL ST

NEW YORK NY 10007
(212) 805-0175
INV: PKG ID: 91807
PO:

REF: EARL GOBIN
DEPT:

RECEIVED
JUL 10 2020
CLERK'S OFFICE
SDNY

USMPJ SDNY

FedEx
Express